[No. B156495. Second Dist., Div. Three. Sept. 26, 2002.]

JUDITH P., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Real Party in Interest.

538

COUNSEL

Nancy Rabin Brucker for Petitioner.

No appearance for Respondent.

Lloyd W. Pellman, County Counsel and Lois D. Timnick, Deputy County Counsel, for Real Party in Interest.

Law Offices of Kenneth P. Sherman and Marissa Coffey for Minors.

## OPINION

**CROSKEY, Acting P. J.**—In this dependency case, Judith P. challenges the order of the trial court made at a scheduled hearing under Welfare and Institutions Code section 366.21, subdivision (f),[1] (1) terminating her right to reunification services and (2) denying her request for a continuance and the setting of the matter for contested hearing. Judith P. is the mother of three children, Chelsea (approximately 14 years old), Courtney (approximately 11 years old) and Casey (approximately five and one-half years old).

The trial court made its order in accordance with the recommendations of the status report prepared and submitted by the Los Angeles County Department of Children and Family Services (DCFS), a copy of which had not been

---

[1]All further statutory references are to the Welfare and Institutions Code except as otherwise noted.

served upon Judith P. (hereafter, Mother) or her counsel until the morning of the hearing. This is contrary to the express mandate of section 366.21, which requires that the status report be served "[a]t least 10 calendar days" prior to the hearing date. We hold that the failure to provide timely service of such report constituted a denial of due process that compels reversal and remand of the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Mother apparently suffers from mental illness, and should be, but at the time the minors were removed from her custody, was not, taking psychotropic medication. In addition, she had been a welfare recipient, and, because of failure to comply with certain requirements, had her benefits cut. She and her children came to the attention of DCFS after she was arrested for shoplifting about $700 worth of jewelry at a department store. She had enlisted Courtney's assistance in removing the security tags from the items to be stolen, and, according to Courtney, Mother had once before had Courtney help her steal items.

In addition to making Courtney steal, Mother also had failed to make sure Courtney attended school. Both Courtney and Casey had been dependents of the court during the 1997 to 1998 school year, at which time Courtney's attendance was acceptable. In 1998, after the children had ceased to be dependents, Courtney's school attendance was atrocious. Mother also appeared unable to control Courtney; Mother reported that when Mother went to sleep, Courtney would sneak out of the house to spend time on the street with her friends.

No relatives were available to take the minors. The maternal grandparents already were legally responsible for taking care of Mother's oldest child, Chelsea, and did not feel able to take responsibility for the other two minors as well. Therefore, minors were placed with a foster family who had already raised four children. The placement went very well; the minors began calling the foster parents mom and dad, their school attendance and work improved dramatically, and after a while the foster parents wanted to adopt them.

As noted above, although the detention hearing was in October 2000, it was not until February 2001 that the jurisdiction and disposition hearing was held, apparently because Mother had been in jail. In February 2001, the minors were declared dependents of the court, custody was placed with DCFS, and DCFS was ordered to give Mother reunification services and monitored visitation. Mother was to attend counseling, a parenting course, and take psychotropic medication if prescribed.

---

[2]The facts we recite are not in dispute and are demonstrated by the record on appeal.

A six-month status review hearing pursuant to section 366.21 was held August 15, 2001.[3] The status report for that hearing indicated that "[a]t this time, the [social worker] cannot ascertain whether [M]other has completed any of the tasks. Phone calls and attempts to meet with [M]other have proved unfruitful. The [social worker] has had only two very brief phone calls with the mother. The phone calls came when the mother contacted the [social worker] to ask a specific question, and then [M]other hung up. Mother did state that she has completed the parenting class at Southern California Counseling Center, but she has not provided the [social worker] with a copy of the parenting certificate. The court ordered that [M]other was to have a psychological evaluation and to be assessed for psychotropic medication. The [social worker] has no knowledge that [M]other has complied with the counseling or with the assessment for medication. The [social worker] has given the mother referrals for counseling." The report also indicated that Mother had not regularly visited with the minors, and that she had told the social worker she was rarely at home, a fact confirmed by the apartment manager when DCFS made an attempted home visit. In addition, when the social worker attempted to confirm that Mother was in counseling, she was unable to do so without the name of the therapist and a consent form from Mother; Mother couldn't give the name or phone number of the psychiatrist or therapist to the social worker.

No change in placement was recommended. The children continued to do very well in the foster home. Mother continued to fail to make regular visits to them. At the August 15 hearing the trial court found Mother was in partial

---

[3]Section 366.21 provides for status review hearings. These reviews are to take place at least every six months. Subdivision (f) provides that the permanency hearing (the section 366.26 hearing) shall be held no later than 12 months after the date the child entered foster care, as that date is determined pursuant to subdivision (a) of section 361.5; however, the maximum amount of time allowed for reviewing a parent's progress toward reunification with his or her children is 18 months from the time the child was originally removed from the parent's custody. (§§ 366.21, subd. (g), 366.22, subd. (a).) At that point, the dependency court *must* make permanent plans for the children.

These review hearings are a crucial component to the constitutionality of California's dependency system. "From the perspective of the parent, review hearings are the essential mechanisms by which he or she may be foreclosed from any further relationship with the child. Parents have a liberty interest in their relationship with their children. This interest is fundamental and, therefore, may not be extinguished without due process. (*Santosky v. Kramer* (1982) 455 U.S. 745 [102 S.Ct. 1388, 71 L.Ed.2d 599].) Family preservation, of which reunification services constitutes an integral component, is the 'first priority' through the review hearing stage of dependency proceedings. (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 [42 Cal.Rptr.2d 200].) During this time, the parent has the best opportunity he or she ever will have to make the strongest case possible in favor of returning the child to parental custody. Thus, review hearings represent one of the '[s]ignificant safeguards . . . built into the current dependency scheme.' (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307, 308 [19 Cal.Rptr.2d 544, 851 P.2d 826].)" (*In re James Q.* (2000) 81 Cal.App.4th 255, 263 [96 Cal.Rptr.2d 595].)

compliance with the case plan, and continued family reunification services. It set the 12-month status review hearing for February 13, 2002, and ordered DCFS to submit a section 366.21, subdivision (f), status report on or before that hearing.

Notably, and of particular relevance to the problem raised by this petition, the juvenile court also set a *sanctions* hearing to be held *if* the status report for the February 1, 2002 hearing was not *filed at least two days before the hearing.* The juvenile court's expectations of DCFS vis-à-vis the timeliness of its status report were quite modest, because section 366.21 actually requires status reports to be filed with the court *and* to be *provided* to parents, legal guardians, and counsel for minors, *at least 10 calendar days* before a review hearing.

When the February 13, 2002 hearing was held, the operative status report had not been filed with the court until the day of the hearing. Furthermore, because the status report was *dated* February 9, a Saturday, the only reasonable inference is that it was not even available to *provide* to the parties, including counsel for Mother and the minors, until the following Monday, February 11—only two days before the hearing. Thus, there is nothing in the record to indicate that DCFS ever attempted to provide this report to the court, Mother or the minor at least 10 days before the February 13 hearing, as required by section 366.21, subdivision (c).[4]

The February 13 status report, just as had the August 15, 2001 report, indicated that DCFS did not know if Mother was in compliance with the case plan or not. DCFS recommended that family reunification services be terminated, that Mother be required to sign consent forms for the release of information on court-ordered counseling, and that visitation still be monitored.

Specifically, DCFS's status report stated that "[Mother] has not maintained contact with DCFS, nor has she provided any proof that she has complied with a single component of her case plan that includes parenting classes, individual therapy and compliance with psychotropic medication. In addition, [Mother] has not maintained consistent contact with her children.

[4]The reporter's transcript contains circumstantial evidence that Mother's counsel and Mother apparently did have access to the report on the day of the hearing, and at oral argument Mother's counsel represented that that was when she first received the report. The hearing was set for 8:30 a.m., but the case was not heard until 2:39 p.m. The transcript of that hearing shows that, at that point, Mother's counsel was able to represent that Mother had told counsel that, contrary to the information in the report, she had complied with the reunification plan, but that the documentary evidence of compliance was at the maternal grandparents' home.

Therefore, [Mother] has not benefited from reunification services and return-ing the children to her care would be detrimental to their wellbeing."

The hearing was set for February 13, 2002, at 8:30 a.m. The hearing did not begin until 2:39 p.m. At the beginning of the hearing, Mother was not present, although she had been in the hallway before the hearing began. Mother's attorney stated, "My client was here all morning. I do not see her out there. I do not know whether she had another appointment or tried to find me. I don't know. I'm going to be making some requests on her behalf."[5]

The dependency court noted that it had read the report, the report was received in evidence, and that "notice has been given as required by law." It then asked some questions about a proposal to send the children to live with a maternal aunt in Louisiana, refused to order an ICPC (a review of an out-of-state possible placement) based on what it termed "flimsy informa-tion," and then began the hearing on the section 366.21, subdivision (f), matter.

Mother's attorney then stated that Mother had told counsel that she had completed her parenting classes, was in individual counseling, and was seeing a psychiatrist for psychotropic medication, as well as a psycholo-gist—all the things required by the case plan, other than visitation with the children. Counsel stated that Mother had not relayed this information to the social worker because the worker had changed so many times that Mother did not know the name of the current social worker.[6] Mother's counsel also represented that Mother was no longer living at her former address, so it appeared that Mother did not get in touch with DCFS, and DCFS did not get in touch with Mother.

Mother's counsel then asked for a continuance of the section 366.21, subdivision (f), hearing or that the court simply wait until the section 366.22 hearing, which already was scheduled for early April, so as to allow time for the social worker to interview Mother and find out exactly how much of the reunification plan Mother had completed. Mother's counsel further repre-sented that Mother had documentation to show that she had completed the parenting class, but that such documentation was at the grandparents' home.

The dependency court expressed its concern that *if* Mother had done anything, she had not told DCFS about it, and some 16 months had passed

---

[5]At oral argument, Mother's counsel represented that, in fact, when she looked in the hallway for Mother, she failed to see Mother, who was not visible because she was lying down on a bench.
[6]The record indicates there were at least six social workers who handled this particular dependency case in a period of less than two years. Whether this explains or excuses Mother's failure to make sure someone knew what she was doing to accomplish the case plan goals is another matter.

since the children had been removed from her care. It indicated that it was therefore inclined to terminate reunification services that day.

Mother's counsel then added that Mother had also been visiting the children on the weekends when the maternal grandparents were picking them up to visit at the grandparents' home. However, she also noted that Mother needed transportation funds so that she could visit the children at other times. She added that Mother was very stressed and emotional that day, because the maternal grandmother had just passed away a few days before, and that that might explain why Mother had left at noon.

The dependency court then said it would order that Mother be given tokens for transportation, but that it was going to terminate reunification services. It found that the children's present placements were necessary and appropriate, that DCFS had complied with the case plan by providing reasonable services, but that Mother's progress in complying with the case plan had been marginal and incomplete and sporadic. It further found that there was clear and convincing evidence that it would be detrimental to return the children to Mother at this time "for the reasons the court has just stated." It then terminated reunification services, and ordered DCFS to provide permanent placement services. At this point, the court commented that Mother had appeared in the courtroom, and then continued with its orders.

Mother's counsel asked for a moment to speak with her client, which was granted, and then said her client wanted to set the matter for a contest. The court stated it really needed to go forward, because it had other cases. Mother's counsel indicated she didn't understand, and reiterated that she needed to set the matter for a contested section 366.21, subdivision (f), hearing. She said she had not asked for a contest earlier because Mother had not been present, but that since Mother had appeared and represented that she was in compliance with the case plan, she was requesting a contested hearing.

Counsel for the minors stated he thought it was too late to seek a contested hearing, and the court agreed, but said it would allow the section 366.26 hearing to be set as a contested matter.

Mother then filed the instant petition for extraordinary relief.

### CONTENTIONS ON APPEAL

Mother contends that the juvenile court erred by failing to allow her to set a contest on DCFS's recommendation to terminate family reunification

services, in other words, a contested section 366.21, subdivision (f), hearing. DCFS did not initially dispute this contention.[7]

DISCUSSION

1. *The Statutory Requirements of the Dependency System and Constitutional Standards*

California's dependency system must pass constitutional muster, because it operates, in many cases, to deprive parents and children of their constitutional rights to parent and of their rights to be raised by their families of origin. It has passed such muster because of the significant safeguards built into this state's dependency statutes. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 255 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) Such safeguards tend to work against the *wrongful* termination of a parent's right to a child even under less than optimum circumstances, such as lack of legal representation. (*In re Angelia P.* (1981) 28 Cal.3d 908, 915-922 [171 Cal.Rptr. 637, 623 P.2d 198]; see, e.g., *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1152-1153 [65 Cal.Rptr.2d 913].)

---

[7]DCFS did not file a response to Mother's petition. Instead, after Mother's petition was filed, and after we had prepared a draft opinion in anticipation of oral argument, the parties filed a stipulation for reversal of the order terminating reunification services, denying a contested section 366.21 hearing, and setting the matter for a section 366.26 hearing.

Because we had already concluded from our review of the record that the order should be reversed, and because we had observed, through our review of the record, that there was some indication of a systemic problem with giving the juvenile court and the parties in dependency proceedings a copy of the status report in a timely manner, we deemed the parties' stipulation to be a waiver of oral argument, and, rather than filing the stipulated order submitted by the parties, we filed a full (unpublished) opinion on April 10, 2002, to point out that there is a statutorily-required amount of notice with which DCFS must comply.

Thereafter, we received a letter from counsel for DCFS, indicating that it objected to our issuing an opinion rather than simply reversing the order with no comment. A stipulated reversal, however, does not necessarily obviate the issuance of an opinion. (See Code Civ. Proc., § 128, subd. (a)(8).) Unless an appellate court can find that "[t]here is no reasonable possibility that the interests of nonparties or the public will be adversely affected by the [stipulated] reversal" (Code Civ. Proc., § 128, subd. (a)(8)(A)), it "*shall* not reverse or vacate a duly entered judgment upon an agreement or stipulation of the parties." (Code Civ. Proc., § 128, subd. (a)(8), italics added.) Notably, however, county counsel did not request oral argument, or suggest that anything in the filed opinion was incorrect.

We then received a letter from counsel for the minors asking us to *publish* the opinion. Counsel for the minors indicated that, in fact, there was a systemic problem with getting status reports even a *few* days before status review hearings, and that counsel in dependency cases were fortunate if they received such reports one or two days before, let alone at least 10 days before a hearing, and that, in fact, counsel often received such reports on the day of the hearing itself. Based on these communications from counsel, we decided to vacate the opinion on our own motion, and to set the matter for oral argument. The parties were invited to submit supplemental letter briefs addressing the issues raised by the failure of the DCFS to provide its reports in conformance with the statutory requirement.

The dependency scheme has been described as a "remarkable system of checks and balances facilitated by the availability of counsel for indigent parents" (*In re Andrew B.* (1995) 40 Cal.App.4th 825, 865 [47 Cal.Rptr.2d 604], disapproved of on another ground, *In re Sade C.* (1996) 13 Cal.4th 952, 982, fn. 11 [55 Cal.Rptr.2d 771, 920 P.2d 716]), which is designed to "preserve the parent-child relationship and to reduce the risk of erroneous fact-finding in . . . many different ways. . . ." (*Cynthia D. v. Superior Court, supra,* 5 Cal.4th 242, 255.) Until permanency planning, reunification of parent and child is the law's paramount concern. (*Id.* at pp. 255-256; §§ 366.21, subds. (e) & (f), 366.22, subd. (a).) Except under specifically described circumstances, the parent is thus entitled to 12 months, and possibly six more months, of reunification *services* (not just a period of time) aimed at assisting the parent in overcoming the problems that led to the child's removal. (§§ 361.5, subd. (a), 366.21, subds. (e) & (f).) The overriding purpose of the dependency system is to "preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare . . . ." (§ 202, subd. (a).) Reunification "shall be a primary objective," and "[t]his chapter [chapter 2, 'Juvenile Court Law'] shall be liberally construed to carry out these purposes." (*Ibid.*)

In keeping with this focus, there is also in force at the dispositional hearing, and at all subsequent prepermanency planning hearings, in other words, at all review hearings, a statutory *presumption* that the child *will* be returned to parental custody. (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) In addition, there are "precise and demanding substantive and procedural requirements [that] the petitioning agency must have satisfied before it can propose termination [that] are carefully calculated to constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents." (*Cynthia D. v. Superior Court, supra,* 5 Cal.4th 242, 256.)

For example, at the dispositional hearing, the agency must show by the enhanced standard of clear and convincing evidence that removal of the child is necessary. (§ 361, subd. (c).) At the interim review hearings, the agency has the burden of showing by a preponderance of evidence that the return of the child to the parent would be detrimental to the child and that reasonable reunification services have been provided. (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) Before reunification can be terminated, the agency must establish by a preponderance of evidence that it would be detrimental to return the child to the parent. (§§ 366.21, subd. (f), 366.22, subd. (a).)

Another safeguard of particular relevance here is the mandatory six-month independent judicial review of the case during the reunification period, during which period numerous positive findings are required with respect to every critical prepermanency planning decision. (§§ 366.21, 366.22.) "The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child." (*Cynthia D. v. Superior Court, supra,* 5 Cal.4th at p. 256.)

Finally, again of relevance here, the dependency statutes provide for *early and complete notification* to the parent of every stage of the proceedings during the entire course of the dependency.[8] (*In re Meranda P., supra,* 56 Cal.App.4th at p. 1155.) In light of the importance of providing constitutionally mandated due process to parents and children in connection with the steps in the dependency system, we next consider what consequences, if any, flow from a failure to give the statutory notice required by section 366.21.

2. *The Purpose Behind Section 366.21's Requirement of at Least 10 Days' Notice of the Information Listed in That Section*

Obviously, the Legislature considered *early* and *complete* notification *before* status review hearings to be of great importance, as shown by its adoption of subdivision (c) of section 366.21. That section provides that "[a]*t least* 10 calendar days" prior to the hearing (italics added), the social worker *shall* file with the court *and* provide to the parents or guardians, and to counsel for any dependent minors, a report on (1) the services provided or

---

[8]The agency must demonstrate its due diligence at the outset when a parent cannot be found. (§§ 311, subd. (a), 361.5, subd. (b)(1).) Then, when a parent is located, so long as the parents' rights have not been terminated, "The child dependency statutory scheme requires parents be notified of *all* proceedings involving the child. (§ 302, subd. (b).) When a social worker, police officer or probation officer takes a child into protective custody, that person must immediately inform the parent and provide a written statement which explains the parent's procedural rights and the preliminary stages of the dependency investigation and hearing. (§ 307.4, subd. (a).) [¶] The parent must also be notified of the detention hearing and given a copy of the dependency petition 'if the whereabouts of each parent . . . can be ascertained by due diligence . . . .' (§ 311, subd. (a).) If it appears the parent cannot read, notice may be given orally. (§ 311, subd. (a).) The parent must be informed of the conditions under which the child will be released, the hearings which may be required, the right to counsel, the privilege against self-incrimination and appeal rights. (§ 307.4, subd. (a).) The parent must also be notified of each review hearing by mail or personal service. (§ 366.21.)" (*In re Raymond R.* (1994) 26 Cal.App.4th 436, 440 [31 Cal.Rptr.2d 551], italics added.) Notification to the parent must also be given about the time and place of the section 366.26 hearing and of the right to have counsel at such proceeding. (§ 366.23, subd. (a).)

offered to the parent or legal guardian to enable him or her to assume custody, (2) the efforts made to achieve legal permanence for the child if efforts to reunify fail, (3) the progress made, (4) where relevant, the prognosis for return of the child to the physical custody of his or her parent or legal guardian, (5) the social worker's recommendation for disposition, and (6) if DCFS does not recommend returning the child to a parent or legal guardian, the specific reason(s) why the return of the child would be detrimental to the child.

■ This particular notice requirement, like all the other above noted safeguards, operates to "constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents." (*Cynthia D. v. Superior Court, supra*, 5 Cal.4th at p. 256.) The 10-day time period assures that the decision maker has an adequate opportunity to review and consider not simply the social worker's recommendations, but the factual bases for such recommendations, and to formulate questions about any discrepancies, omissions, or other matters of concern raised by the report.

In addition, the 10-day time period allows parents and counsel for minors the time not only to review and consider the contents of the report and the recommendations, but also to assemble their own evidence that contradicts or explains information contained in the report, to analyze the recommendations in light of such other information, and to generate alternative recommendations and persuasive arguments in support of such alternative recommendations.[9] It also allows counsel time to subpoena witnesses to be present at the hearing, to prepare for questioning and cross-examination of witnesses, and, of course, to consult with their clients. Obviously, counsel appointed to represent parents and children in such significant proceedings are entitled to sufficient time to meet such minimum standards of practice.[10] It is clear that the Legislature concluded that 10 days was the minimum time

---

[9]In addition, it also gives parents time to obtain the various certificates of completion, psychological tests and evaluations, and drug and alcohol tests and test results that are often a staple of reunification plans.

[10]Section 24 of the Standards of Judicial Administration Recommended by the Judicial Council, contained in division I of the appendix to the California Rules of Court, specifically provides, in section 24(c)(3), that the presiding judge of the juvenile court should "[e]stablish minimum standards of practice to which all court-appointed and public office attorneys will be expected to conform. These standards should delineate the responsibilities of attorneys relative to investigation and evaluation of the case, preparation for and conduct of hearings, and advocacy for their respective clients."

Needless to say, it would be unjust to hold counsel for parents and minors to such standards without providing counsel with the time necessary to meet them. Furthermore, as noted earlier, the dependency scheme is a "remarkable system of checks and balances *facilitated by the availability of counsel.* . . ." (*In re Andrew B., supra*, 40 Cal.App.4th at p. 865, italics

necessary to allow such standards to be met, as well as to allow a parent to obtain the kinds of evidence relevant to the parent's progress.

### 3. The Requirement That a Status Report Shall Be Filed and Served at Least 10 Days Before a Section 366.21 Status Review Hearing Is Mandatory and Obligatory

■ Section 366.21 provides that, *at least* 10 days before the section 366.21 hearing, the social worker *shall* file with the court, *and* provide the parents, legal guardians, and minors' counsel with, a report containing information on *all* of the above noted factors. What are the consequences of a failure to comply with this notice requirement? The answer to that important question depends on whether the 10-day provision is deemed mandatory and obligatory, rather than permissive or directory.

■ " '[T]he "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates. [Citations.]' [Citation.] If the failure to comply with a particular procedural step does not invalidate the action ultimately taken, as determined by applying certain tests discussed below, the procedural requirement is referred to as 'directory.' If, on the other hand, it is concluded that noncompliance does invalidate subsequent action, the requirement is deemed 'mandatory.' [Citation.]" (*Edwards v. Steele* (1979) 25 Cal.3d 406, 409-410 [158 Cal.Rptr. 662, 599 P.2d 1365].)

Generally, requirements relating to the time within which an act must be done are directory rather than mandatory or jurisdictional, unless a contrary intent is clearly expressed. (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1144-1145 [43 Cal.Rptr.2d 693, 899 P.2d 79]; *Edwards v. Steele, supra,* 25 Cal.3d at p. 410 and cases cited there; *International Medication Systems, Inc. v. Assessment Appeals Bd.* (1997) 57 Cal.App.4th 761, 766 [67 Cal.Rptr.2d 394].) In ascertaining probable intent, California courts have expressed a variety of tests. In some cases, focus has been directed at the likely consequences of holding a particular time limitation mandatory, in an attempt to ascertain whether those consequences would defeat or promote the purpose of the enactment (the "promotes test"). (*California Correctional Peace Officers Assn. v. State Personnel Bd., supra,* 10 Cal.4th at p. 1145; *Edwards v. Steele, supra,* 25

added.) Obviously, the mere *availability* of counsel is *meaningless* if counsel has no meaningful opportunity to actually represent clients' interests.

Cal.3d at p. 410.) Other cases have suggested that a time limitation is deemed merely directory " ' "unless a consequence or penalty is provided for failure to do the act within the time commanded [the 'penalties test']." ' " (*California Correctional Peace Officers Assn. v. State Personnel Bd., supra,* 10 Cal.4th at p. 1145; *Edwards v. Steele, supra,* 25 Cal.3d at p. 410, both quoting *Garrison v. Rourke* (1948) 32 Cal.2d 430, 435-436 [196 P.2d 884], overruled on another point in *Keane v. Smith* (1971) 4 Cal.3d 932, 939 [95 Cal.Rptr. 197, 485 P.2d 261].) Here, the application of each of these general tests to section 366.21's minimum 10-day requirement leads us to conclude that the 10-day time period was intended to be mandatory.

Applying the "promotes test," a conclusion that the 10-day minimum requirement is mandatory would, in fact, promote the purpose behind the dependency law. As already noted, it is the intent of the Legislature to "preserve and strengthen the minor's family ties whenever possible, removing minor from the custody of his or her parents only when necessary for his or her welfare . . . ." (§ 202, subd. (a).) Reunification "shall be a primary objective," and the dependency statutes are to be liberally construed to carry out these purposes. (*Ibid.*) This purpose—to keep existing families together—is of paramount importance at all prepermanency planning stages of the proceedings; in other words, at just such hearings as the one at issue here. (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) A holding that the 10-day minimum notice period for all prepermanency planning status review hearing reports is mandatory would mean that parents and children would have a fair opportunity to review the status report, and to be heard as to any omitted evidence or argument favoring continuation of reunification services or reunification itself. In fact, such notice period is *essential* to promote the statutory design, and goes to " ' "the essence" of the particular object sought to be obtained, or the purpose to be accomplished,' " (*Cal-Air Conditioning, Inc. v. Auburn Union School Dist.* (1993) 21 Cal.App.4th 655, 673 [26 Cal.Rptr.2d 703]), to wit, "to reduce the risk of erroneous fact-finding in . . . many different ways. . . ." and to thereby "preserve the parent-child relationship" whenever possible (*Cynthia D. v. Superior Court, supra,* 5 Cal.4th 242, 255), and thus its mandatory/obligatory nature is all the more apparent. (*Cal-Air Conditioning, Inc. v. Auburn Union School Dist., supra,* 21 Cal.App.4th 655, 673.)

When we apply the "penalties test," such test, at first blush, militates in favor of a holding that the 10-day time requirement is *not* mandatory/ obligatory, because section 366.21 does not *itself* expressly provide for a consequence or penalty for DCFS's failure to provide parents and children with a copy of the status report within the time commanded. The failure of a statutory provision to provide for a consequence or penalty for noncompliance strongly suggests that the provision is merely directory. (*Florence*

*Western Medical Clinic v. Bonta'* (2000) 77 Cal.App.4th 493, 504 [91 Cal.Rptr.2d 609].) However, it is clear that the dependency scheme *as a whole,* because its end result may be to deprive parents and children of their constitutional rights, has been designed to meet federal constitutional requirements. (*Cynthia D. v. Superior Court, supra,* 5 Cal.4th at p. 255.) Although section 366.21 itself does not expressly provide for a consequence or penalty for failing to meet its time requirements, the due process provisions of the state and federal Constitutions *do* provide that actions taken in violation of reasonable notice requirements are invalid. (See, e.g., *Alliance Bank v. Murray* (1984) 161 Cal.App.3d 1, 6 [207 Cal.Rptr. 233] [court's authorization of an ex parte application for sanctions in the event of disobedience of a discovery order was not only in excess of the court's jurisdiction, because it was expressly violative of the statutory notice and motion requirements of Code Civ. Proc., § 2034, subd. (d), which required written notice of such motion at least 15 days in advance of the hearing, but also was violative of the constitutional due process notice requirement of the federal and state Constitutions and therefore invalid for being in excess of the court's jurisdiction]; *Rodman v. Superior Court* (1939) 13 Cal.2d 262, 269 [89 P.2d 109] ["when a statute authorizes prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction"]; *O'Brien v. Cseh* (1983) 148 Cal.App.3d 957, 961 [196 Cal.Rptr. 409] ["[a]dequate notice . . . is mandated not only by statute, but also by the due process clauses of both the state and federal Constitutions"].)

Thus, despite section 366.21's lack of a specific penalty for failure to meet the 10-day requirement, we conclude that when the Legislature expressly provided that parents and children "shall" be given *at least* 10 days' notice of the status report, it did so with the knowledge that by setting a minimum amount of notice as the standard of what was reasonable, in other words, the constitutional due process standard, it intended that the legal result of failure to comply with such constitutional standard and the resulting invalidity of the ruling would itself be the consequence.

The application of additional rules of statutory construction also confirm that this particular time requirement should be treated as mandatory. The word "shall," when used in a statute, is ordinarily construed as mandatory or directory, as opposed to permissive (*California Correctional Peace Officers Assn. v. State Personnel Bd., supra,* 10 Cal.4th at p. 1145; *Estate of Justesen* (1999) 77 Cal.App.4th 352, 361 [91 Cal.Rptr.2d 574]), particularly when, as here, the Legislature has used both the terms "shall" and "may" in the same statute. (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]; *Maryland Casualty Co. v. Andreini & Co.* (2000) 81 Cal.App.4th 1413, 1420 [97 Cal.Rptr.2d 752].) Furthermore, when

a statute uses language such as "at least," it is a good indication that the Legislature meant precisely that: that *at least* that amount of time is the *reasonable* amount of time needed for purposes of due process. (Cf. *Ursino v. Superior Court* (1974) 39 Cal.App.3d 611, 619 [114 Cal.Rptr. 404] [use of the word "shall" in conjunction with the phrase "not later than" in ordinance pertaining to time within which city board of permit appeals was required to act on an appeal was clearly indicative of a mandatory declaration of time].)

A statute designed to provide protection for individuals is generally construed to have mandatory effect (*People v. McGee* (1977) 19 Cal.3d 948, 958 [140 Cal.Rptr. 657, 568 P.2d 382], abrogated on other grounds by subsequent legislative action; see *People v. Preston* (1996) 43 Cal.App.4th 450, 458 [50 Cal.Rptr.2d 778] [statutory requirement that restitution be sought before bringing criminal action for welfare fraud was intended to provide protection for individuals and therefore had mandatory effect]), while provisions enacted to secure the orderly conduct of business (as opposed to provisions enacted for the benefit of the individual) are directory. (*Skelly Estate Co. v. City and County of San Francisco* (1937) 9 Cal.2d 28, 33 [69 P.2d 171]; *Ryan v. Byram* (1935) 4 Cal.2d 596, 603 [51 P.2d 872]; *Western/California, Ltd. v. Dry Creek Joint Elementary School Dist.* (1996) 50 Cal.App.4th 1461, 1498-1499 [58 Cal.Rptr.2d 220].)[11] Here, section 366.21's notice provisions are designed to protect the constitutional rights of individual parents and children involved in the dependency system. And, by protecting the rights of individual family members to make sure that decisions are made based on accurate information, the section also serves the public purpose of strengthening and maintaining families; in such a case, the provision may be held directory or mandatory as will best accomplish that public purpose. (*California Correctional Peace Officers Assn. v. State Personnel Bd., supra,* 10 Cal.4th at p. 1143; *Western/California, Ltd. v. Dry*

---

[11] " '[An individual litigant] ought always to be at liberty to insist that directions which the law has given to its officers for his benefit shall be observed.' " (*Ryan v. Byram, supra,* 4 Cal.2d at p. 604; *People v. McGee, supra,* 19 Cal.3d at p. 962.) In *French v. Edwards* (1871) 80 U.S. (13 Wall.) 506, 511 [20 L.Ed. 702, 703], Justice Field, writing for a unanimous court, drew a similar distinction between statutory procedures which are *not* related to the protection of individual citizens and those procedures which *are* designed for an affected individual's benefit. Justice Field wrote: "There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such generally are regulations designed to secure order, system, and dispatch in proceedings, and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory. . . . But when the requisitions prescribed are intended for the protection of the citizen, . . . and by a disregard of which his rights might be and generally would be injuriously affected, they are not directory but mandatory. They must be followed or the acts done will be invalid. . . ." (See also *People v. McGee, supra,* 19 Cal.3d at pp. 962-963.)

*Creek Joint Elementary School Dist., supra,* 50 Cal.App.4th at pp. 1498-1499.) Holding the 10-day notice requirement to be mandatory will best accomplish that public purpose for the same reason that it protects individual parties in a dependency proceeding.[12]

4. *The Failure to Provide Parents and Children with the Status Report at Least 10 Days Before a Status Review Hearing Is Per Se Reversible Error in the Absence of Either a Continued Hearing or an Express Waiver*

 Having held that DCFS has a mandatory duty to provide parents and children with the status report at least 10 days before a prepermanency planning review hearing, and that the Legislature intended that 10 days was the *minimum* time necessary to allow to parents, children, and/or their attorneys to investigate, evaluate, and prepare for review hearings, we next consider the consequences of a failure to provide this minimum amount of notice.

DCFS contends that the failure to provide a parent or child with such notice should be reviewed using a harmless error standard, under which it is up to the aggrieved parent or child to show that, in the absence of the error,

---

[12]DCFS urges that the notice provision is merely directory, citing *In re Charles B.* (1986) 189 Cal.App.3d 1204 [235 Cal.Rptr. 1], a case that is entirely distinguishable from the case here. In *In re Charles B.,* the juvenile court *dismissed* a dependency proceeding after a proposed new original report for a six-month review was not filed and served, as required by section 366.2, subdivision (c), within 14 days before the hearing. The report had recommended that the mother be given custody of her children, but on the day before the hearing she told the social worker she was leaving the area and could not take the children with her.

The county asked for a continuance to devise an alternative plan, but the father objected, raising the time requirement, arguing that it was mandatory, and moving for dismissal for failure to comply, which the juvenile court reluctantly granted, stating on the record that it did not feel dismissal was in the best interests of the minors.

The appellate court reversed, holding that not all statutory usages of the word "shall" indicate a mandatory, in other words, *jurisdictional,* duty, the failure to perform which duty *strips a court of the power to proceed.* The reviewing court held that time requirements were to be considered directory in the absence of a clear legislative intent that failure to comply deprives the court of jurisdiction, particularly when the statute involved imposed a duty on a public agency related to protecting the welfare of minors. The court noted that a related statute, section 352, specifically authorized a continuance if not contrary to the best interests of the minor, and found that a continuance was virtually compelled where it was not until the day before the hearing that the county discovered its plan for the minors was not practicable.

Here, we do not hold that the notice requirement is mandatory in the sense that it is jurisdictional so as to require dismissal in the face of noncompliance. Instead, we hold that it is mandatory and directory in the sense that parents and children have an absolute right to a minimum of 10 days' notice of the status report's contents in order to prepare for the status review hearing, and that the failure to accord them such notice requires either an express waiver of this right or a continuance of the hearing date.

there is a reasonable probability that a more favorable result would have been obtained. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].) Mother and minors contend that the failure to give the minimum mandated notice should, at the least, be reviewed using a harmless-beyond-a-reasonable-doubt standard, under which DCFS, as the beneficiary of a constitutional error, must show that the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-711, 24 A.L.R.3d 1065].) Minors' counsel also made a very compelling case at oral argument that a per se reversible error standard should be applied, because the failure to provide this kind of notice is in the nature of a structural, rather than a trial, constitutional error. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309-311 [111 S.Ct. 1246, 1264-1266, 113 L.Ed.2d 302]; *People v. Marshall* (1996) 13 Cal.4th 799, 851-852 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

Although *Arizona v. Fulminante, supra,* 499 U.S. 279, analyzed the consequence of an error implicating the constitutional rights of a *criminal* defendant, California courts have frequently relied upon such United States Supreme Court analysis in analogous situations in which the fundamental constitutional right to parent is the subject of some error.[13] *Arizona v. Fulminante* involved the erroneous admission at trial of an allegedly coerced

---

[13]See, e.g., *In re Angela C.* (2002) 99 Cal.App.4th 389, 394 [120 Cal.Rptr.2d 922], and cases cited there: *In re Dolly D.* (1995) 41 Cal.App.4th 440, 446 [48 Cal.Rptr.2d 691] (a violation of right to confront and cross-examine witnesses); *In re Andrew S.* (1994) 27 Cal.App.4th 541, 547 [27 Cal.App.4th 1668b, 32 Cal.Rptr.2d 670] (a violation of the right to counsel); *In re Amy M.* (1991) 232 Cal.App.3d 849, 868-869 [283 Cal.Rptr. 788] (another violation of witness-confrontation rights). In *In re Angela C., supra,* 99 Cal.App.4th at page 395, after accepting the proposition that the application of constitutional principles developed in criminal cases was appropriate in dependency cases, the court then considered the per se reversible error standard of *Arizona v. Fulminante, supra,* 299 U.S. 279, but concluded that the error before it was a "trial" error rather than a structural error (the parent had received notice of a post-permanency-planning hearing [a § 366.26 hearing], which she failed to attend; however, she was not given notice of the continued hearing).

The fact that our case involves a prepermanency planning hearing, while *In re Angela C.* is a permanency planning case, is an important distinction. The cases are clear that the interests of the parent vis-à-vis the minor are stronger and the burden of proof is on DCFS, not the parent, at the prepermanency planning stage: there must be a finding that return to the parent would be detrimental to the child, and DCFS bears that burden of proof. Thereafter, the standard becomes "best interests of the child," and the parent bears the burden of proving that a particular disposition would be in the child's best interests.

In *In re Angela C.,* by the stage of the section 366.26 hearing, it was up to the mother to show that an exception applied to overcome the presumption that adoption was the best permanency plan. To do so, the mother had to show not only that some other plan was in the child's best interests, but *also* that she had maintained regular visitation with the child. The appellate court relied on the existing record (developed without mother's attendance at the hearing), which showed that mother had not maintained regular contact with the child. Thus, the appellate court felt it could conclusively state that, even *if* mother had had notice of the

confession. The Supreme Court held that the confession *was* coerced and the error in admitting it was not harmless, but that because such error was in the nature of a "trial" error rather than a "structural" error, the harmless error standard of review, rather than a per se reversible error standard, applied to admission of involuntary confessions. The court then affirmed the defendant's death sentence.

Obviously, the facts in this dependency case are not analogous to the facts in *Arizona v. Fulminante*. What is analogous, and is applicable, however, is the concept of looking at the stage at which a particular constitutional error occurs in order to determine what standard of error review should be applied. ■ "Trial error" is error that occurs *during* the *presentation of the case*. (*Arizona v. Fulminante, supra,* 499 U.S. at p. 307 [11 S.Ct. at pp. 1263-1264].) An error that occurs during the trial process itself does not require automatic reversal because a court may quantitatively assess such error in the context of other evidence presented in order to determine whether the error was harmless beyond a reasonable doubt. (*Id.* at pp. 307-308 [111 S.Ct. at pp. 1263-1264].)

In contrast, "structural" errors involve " '*basic* protections, [without which] a criminal trial cannot reliably serve its function as a *vehicle* for determination of guilt or innocence, and no criminal punishment may be regarded as *fundamentally fair*.' " (*Arizona v. Fulminante, supra,* 499 U.S. at p. 310 [111 S.Ct. at p. 1265], italics added.) Examples of such structural errors that result in automatic reversal (the per se reversible error standard) include total deprivation of the right to counsel at trial, a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, denial of the right to a public

---

hearing, she could not have overcome the lack of visitation—and there could have been no other outcome than the freeing of the child for adoption.

The appellate court in *In re Angela C.* concluded that the failure to give notice of the section 366.26 hearing was "in the nature of a trial error," as opposed to a "structural error." Notably, in discussing why this was a "trial error," and as such judged by a harmless error standard, rather than a structural error, to which a per se standard applies, the court in *In re Angela C.* emphasized the fact that the mother *had* received proper notice of the original section 366.326 hearing, *and it was only the continued date of which she was not given notice.* Apparently, the court concluded that if she had been in attendance at the time originally scheduled, she would have heard the notice of the continued date, and thus she had constructive notice of the continued date.

Here, the error is not equivalent to that in *In re Angela C..* The error here implicated Mother's potential right to another six months' of reunification services, as well as her ability to continue to visit her children. Mother's ability to visit her children was implicated by the granting or denial of the section 366.21 hearing, because such hearing offered her an opportunity to get a court order for transportation assistance if, in fact as she claimed, she could show that her ability to travel to visit the children had been impaired by lack of funds. In contrast, in *In re Angela C.,* the mother's reunification rights had already been terminated.

trial, and an erroneous reasonable doubt instruction to the jury. (*Id.* at pp. 309-310 [111 S.Ct. at pp. 1264-1265].)

▮▮▮▮ Of course, the difference between a criminal case and a dependency case is that the first is resolved with a single trial, while the latter generally is necessarily resolved in stages, each of which, during the pre-permanency-planning stage, involves a time-limited attempt by a parent to improve enough to regain custody or to at least get additional reunification services. A criminal prosecution ends with a single trial; absent a hung jury, the defendant is either acquitted or convicted. If a defendant is convicted, he or she may point to the deprivation of a constitutional right as having led to such conviction. The conviction, if obtained in violation of a constitutional right, for example, the denial of the constitutional right to counsel, is a denial of the constitutional right to liberty.

In dependency cases, the analogous equivalent of a conviction (loss of liberty) is the permanent termination of the parent/child relationship (loss of the right to parent). In the dependency setting, the loss of the constitutional right does not necessarily occur at the same hearing at which an error denied the parent some other constitutional right, for example, the constitutional right to due process. Instead, the denial of such right at an earlier stage may simply have made it easier (given the shift in burdens and standards of proof between the pre-permanency-planning and permanency-planning stages) for the ultimate loss of the constitutional right to parent at a subsequent hearing.

The bottom line in both criminal and dependency proceedings is that *both* defendants and parents face the deprivation of a fundamental constitutional right via adjudicatory processes. Such adjudicatory processes share similar attributes: regardless of whether the right to liberty or the right to parent is at stake, such persons are entitled to (1) notice of the allegations made against them and to an opportunity to prepare to refute such allegations, (2) present evidence, (3) call and examine witnesses, and (4) present argument on their own behalf. Thus, in both kinds of cases, a record is created which is equally susceptible to the 'trial" versus "structural" error analysis of *Arizona v. Fulminante.* Accordingly, we shall apply this trial versus structural error analysis here.

For purposes of applying such analysis to this pre-permanency-planning hearing, we paraphrase *Arizona v. Fulminante.* First, did the failure to give Mother here at least 10 days' notice implicate a " '*basic* protection[], [with-out which] a [section 366.21 hearing] cannot reliably serve its function as a *vehicle* for determination of [a parent's right to continued reunification

services leading to potential return of his or her child]'"? (*Arizona v. Fulminante, supra,* 499 U.S. at p. 310 [111 S.Ct. at p. 1265], italics added.) Second, was the setting of a section 366.26 hearing (at which the burden of proof and presumptions shifts in favor of terminating parental rights and adoption is the presumed outcome), and the termination of reunification services for the family, "*'fundamentally fair,'*" in the absence of proper notice and an opportunity to be heard at the section 366.21 hearing? (*Arizona v. Fulminante, supra,* 499 U.S. at p. 310 [111 S.Ct. at p. 1265], italics added.)

Applying the trial versus structural error analysis here, the failure to give a parent or minor adequate time to prepare for a section 366.21 hearing is an error that does not happen *during* the presentation of the case; in other words, it does not happen *during* the section 366.21 hearing. Rather, it happens before the hearing. Nor does this kind of error allow an after-the-event assessment of the error in relation to what *did* happen at the hearing. If a section 366.21 hearing is actually held, albeit with less than 10 days' notice of the contents of the status report, it is not possible to do an after-the-event assessment of the error. Unlike erroneous admission of evidence or improper instructions, which can be reviewed in light of the evidence or instructions as a whole, the impact of having less than the statutorily mandated minimum time within which to (1) confer with one's lawyer, (2) contact witnesses, (3) obtain documents, (4) prepare for examination and cross-examination, and (5) hone one's arguments, is impossible for either a trial court or an appellate court to assess. Thus, these factors indicate that the error is not a trial error.

In addition, other factors suggest that the failure to give adequate opportunity to prepare for a section 366.21 hearing is a structural error. "Structural" errors involve "*basic* protections, . . . [without which] a [dependency] trial cannot reliably serve its function as a *vehicle* for determination of [whether a child cannot be safely returned to its parent's custody], and no [continuing deprivation of custody, let alone permanent termination of parental rights] may be regarded as *fundamentally fair.*" Timely notice of the "charges" against a parent, and the witnesses who are able to give evidence in support thereof, is a fundamental protection, without which no dependency trial can *reliably* serve its function as a vehicle by which the trier of fact can determine whether the parent is making progress so as to be entitled to further reunification services or even reunification, or whether it would be detrimental to the children to reunify with the biological family. If a section 366.21 hearing does not provide parents and children with the minimal due process required by statute, the resulting process, in the absence of a knowing and intelligent waiver of the right to such due process, cannot be regarded as *fundamentally fair.* It is fundamentally *unfair* to terminate either

a parent's or a child's familial relationship if the parent and/or child has not had an adequate opportunity to prepare and present the best possible case for continuation of reunification services and/or reunification.

Based on these factors, we conclude that the failure to give Mother the minimum mandated 10 days' notice was a structural error, and that the per se reversible error standard applies. Accordingly, the order terminating reunification services and denying Mother's request for a continuance and the setting of contested hearing must be reversed.

Practically speaking, our holding mandates that any party to a dependency proceeding who did not receive the status report at least 10 days before a prepermanency planning review hearing must be granted a continuance or must expressly waive his or her right to the timely service of such report.

5. *The Section 366.21 Hearing in This Case Was Invalid for Lack of Proper Statutory Notice*

In this case, Mother was sent a *notice* of the fact and date of the February 13 *hearing* on January 28—at least 10 days before the hearing. This notice stated that DCFS recommended terminating reunification services to Mother, but it did not state the social worker's *recommendation for disposition*, which was adoption of the children by the foster family. More to the point, there is no indication that Mother, her attorney, or counsel for the minors here were provided with a copy of the status report at *all* before the hearing, let alone *at least 10 days beforehand.* Because we have concluded that such notice was mandatory, DCFS's failure to provide Mother (and the minors' counsel) with a copy of such report within the time specified by statute requires that the resulting order be invalidated.

Because neither Mother, Mother's counsel, nor minors' counsel received the statutorily required copy of DCFS's status report, they did not have reasonable notice of the issues raised by such report, and no reasonable opportunity to prepare to rebut the evidence contained in the report via a contested hearing. The lack of reasonable notice was not only a violation of the statute, but also a violation of constitutionally required due process. We therefore must reverse the order terminating reunification services and setting a section 366.26 hearing.

DISPOSITION

Mother's petition for extraordinary relief is granted. Let a peremptory writ of mandamus issue directing the trial court to vacate its order of February

13, 2002. Upon remand, the juvenile court shall conduct a contested section 366.21 hearing, and, based on that hearing, redetermine the issue of termination of family reunification services, and conduct further proceedings not inconsistent with the views expressed herein.

Kitching, J., and Aldrich, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied December 18, 2002.