[No. G044657. Fourth Dist., Div. Three. June 28, 2011.]

In re A.D., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
C.Q., Defendant and Appellant.

1320

COUNSEL

Jesse Jack McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

OPINION

**RYLAARSDAM, Acting P. J.**—C.Q. (mother), mother of now 14-year-old A.D., arrived at the courthouse after the 12-month review hearing was completed. Based on the stipulation of counsel, the juvenile court had issued orders terminating reunification services and selecting a permanent plan of long-term foster care for A.D. The juvenile court refused to vacate its orders and allow mother to have a contested hearing. Mother appeals, contending the juvenile court erred because she was not given proper notice of the hearing and she had a statutory and due process right to a contested hearing.

We find the juvenile court's refusal to vacate its orders was not an abuse of discretion. We further find the failure to give notice was harmless. Accordingly, we affirm.

FACTS

In October 2007, 10-year-old A.D. and her 11-year-old sister were taken into protective custody in Los Angeles County after authorities served a search warrant at the house where mother and the children were living. The search revealed "a significant amount of methamphetamines ready and packaged for sales" and five weapons, all within reach of the children. Two other families lived in the home, which was the site of known gang activity. Mother denied any knowledge of illegal activity in the home but admitted to recent use of methamphetamine and marijuana. The father, F.D., did not live in the home, and his whereabouts were unknown.

In January 2008, the Los Angeles County Juvenile Court sustained dependency petitions on behalf of the children under Welfare and Institutions Code section 300, subdivisions (b) (failure to protect) and (g) (abandonment). (All further statutory references are to the Welfare and Institutions Code.) The children were placed with their maternal cousin and her husband. Mother moved into the maternal grandmother's home and enrolled in counseling and

an outpatient drug rehabilitation program. In April 2008, the court held the disposition hearing. The social worker reported mother was participating in her programs and consistently attending unmonitored visits with the children. The court released the children to mother under a plan of family maintenance.

In May 2008, the case was transferred to Orange County because mother and the children moved to the maternal grandfather's home. For the next 18 months, mother participated in her case plan and appeared committed to the children. However, she tested positive for methamphetamine use on three occasions: In October 2008, "she had been at a party with friends . . . and she was tempted and used"; in February 2009, she had a positive test but denied use; and in August 2009, she "admitted to using methamphetamine while hanging out with some of her friends." Each time, the social worker recommended leaving the children in mother's home. After the August 2009 positive test, however, the juvenile court expressed its concern about the safety of the children in light of mother's failure to make good decisions and exhorted her to make more progress with her services. "When I see this kind of report, I'm concerned for you and your kids, two wonderful girls. You want them to grow up the best that they can be. So you know what you need to do."

In October 2009, mother missed two drug tests. At the second of the two, the monitor reported seeing mother eject a plastic tube of urine from her vagina while purporting to provide a urine sample. The monitor told mother she would not accept the sample because she suspected it was altered. Mother "became hostile, cursed and stormed out of the clinic cursing." After receiving the monitor's report, the social worker detained the children and placed them in Orangewood Children's Home. Subsequently, the social worker discovered that mother had been arrested a few months before but had not reported it.

Orange County Social Services Agency (SSA) filed a supplemental petition on November 3, 2009, alleging the children were at risk in mother's care due to missed drug tests, failure to follow her case plan, and failure to inform the social worker of her arrest in June 2009 for possession of methamphetamine and drug paraphernalia. The older sister ran away from Orangewood two weeks later, and the hearing on the supplemental petition was continued several times while efforts to find her were underway. She was never located, however, and the hearing went forward on May 27, 2010.

In the reports prepared for the hearing, SSA reported mother renewed her efforts to comply with her case plan after the supplemental petition was filed, reenrolling in drug counseling and resuming drug testing. But in February 2010, mother was discharged from her drug treatment program for sporadic

attendance and two drug tests that were positive for methamphetamine. She cancelled her visits with A.D. "[m]ore often than not." A.D. exhibited emotional problems, cutting herself with sharp objects and neglecting her schoolwork. She was placed with a foster family in early December 2009.

At the hearing the juvenile court sustained the supplemental petition, which had been amended to remove the allegation that mother tried to fabricate the October 2009 drug test result. Through a comment made by mother's sister to A.D., the social worker learned in June that mother was incarcerated in Los Angeles County. An investigation revealed she had been sentenced to 120 days in custody on June 17 on a felony charge. The disposition hearing was held on June 30, 2010. The juvenile court removed A.D. from mother's custody, approved weekly monitored visits, and ordered mother to participate in counseling, drug testing, and a 12-step program. The court set a review hearing for January 3, 2011.

A.D. continued to have problems. She ran away from her foster home in late May 2010. She was found later that day, removed from her foster family, and returned to Orangewood. In early July, she ran away from Orangewood but returned on her own two days later. Later that month, A.D. was caught shoplifting in a Wal-Mart while visiting with a prospective foster mother. Nevertheless, A.D. was placed in that foster home on August 12, 2010. She met weekly with her therapist, who reported that A.D. was "positive and open in sessions." In December, A.D. was suspended from school for three days for being intoxicated and disruptive. But both she and the foster mother were happy and comfortable with the placement and were "work[ing] through the issues that have occurred."

In the report prepared for the January 2011 review hearing, the social worker reported she had been unable to meet with mother during the previous six months because mother had neither a telephone nor a permanent place to live. Mother participated in drug testing "sporadically" but otherwise ignored her case plan. Her visits with A.D. were "sporadic and inconsistent" until mid–November 2010, when they increased and became more consistent. The social worker recommended termination of reunification services and a permanent plan of long-term foster care because it did not seem that mother was "motivated to reunify with the child" and A.D. did not want to be adopted.

The review hearing took place on the morning of January 3, 2011. Mother was not present. Counsel for all parties stipulated to SSA's recommendation to terminate reunification services and place the child in long-term foster care. The court observed, "[It] doesn't seem like there is . . . any realistic opportunity for reunification because mother simply is not putting forth any

reasonable effort despite all the services that have been offered . . . ." The juvenile court found that notice of the hearing was given to all parties as required by law, reasonable services had been provided, and continued supervision was necessary. It terminated reunification services and ordered long-term foster care as the permanent plan. The court found a hearing under section 366.26 was not in the child's best interest because she was not a proper subject for adoption and there was no one available to accept legal guardianship.

The juvenile court called the matter again at the beginning of the afternoon calendar, because mother's counsel had informed the court that mother had arrived and asked that the matter be reheard. The court noted mother was present and that it would give all parties an opportunity to be heard. Mother's counsel asked the court to vacate the orders terminating services and placing the child in long-term foster care. "I have not been able to have contact with my client up until today. The [hearing] date set today was set on . . . a date when mother was not present. It does appear there may have been some notice issues with regard to that. [¶] In speaking to mother . . . after the case had already been called, she indicated that she is not in support of [SSA's] recommendation[s] . . . . She believes that she's in a position now where she has funding available to attend the classes and to try to work on her case plan which she did not have previously. She just is a recent recipient of Medi-Cal. [¶] . . . [I]n light of that fact and in light of mother's appearance at this point in time and express desire to not resolve this case to a long-term foster care situation, we would request the court vacate the orders and set the matter for a contested 12-month review . . . ." Mother's counsel explained that the last contact her office had with mother was in March of 2010. Counsel left a phone message for mother on December 30, 2010, "advising her, as she had not been given proper notice before, that I can see, since she wasn't present at any court dates where we set this hearing, that this matter was going to be on calendar today."

A.D.'s counsel did not object to mother's request. "Mother did show up before noon on a day that it's been raining. And I know she relies on public transportation." County counsel pointed out the court would have to find a substantial probability of return to extend reunification services, which was not supported by the record. The court found there had been no good cause or change in circumstances shown to justify a modification of its orders and denied the motion to vacate them.

## DISCUSSION

Mother contends the orders should be reversed because SSA failed to give her the required notice of the review hearing and failed to provide her

with a copy of SSA's report. As we explain, a failure to give notice in dependency proceedings is subject to a harmless error analysis. Because mother did not show a more favorable result was likely absent the error, the orders stand.

 SSA concedes there is no record that mother received the statutorily mandated notice of hearing or a copy of SSA's report. Section 293 provides that notice of a 12-month review hearing shall be given no more than 30 nor less than 15 days before the hearing. (§ 293, subd. (c).) "The notice shall contain a statement regarding the nature of the hearing to be held and any change in the custody or status of the child being recommended by the supervising agency. If the notice is to the child, parent or parents, or legal guardian or guardians, the notice shall also advise them of the right to be present, the right to be represented by counsel, the right to request counsel, and the right to present evidence. The notice shall also state that if the parent or parents or legal guardian or guardians fail to appear, the court may proceed without them." (§ 293, subd. (d).) Section 366.21 provides: "At least 10 calendar days prior to the hearing, the social worker shall file a supplemental report with the court regarding the services provided or offered to the parent or legal guardian to enable him or her to assume custody and the efforts made to achieve legal permanence for the child if efforts to reunify fail . . . ; the progress made; and, where relevant, the prognosis for return of the child to the physical custody of his or her parent or legal guardian; and shall make his or her recommendation for disposition. . . . If the recommendation is not to return the child to a parent or legal guardian, the report shall specify why the return of the child would be detrimental to the child. The social worker shall provide the parent or legal guardian, counsel for the child, and any court-appointed child advocate with a copy of the report, including his or her recommendation for disposition, at least 10 calendar days prior to the hearing." (§ 366.21, subd. (c).)

Mother argues this notice failure is structural error and thus reversible per se. Two cases from this court have so held. In *In re DeJohn B.* (2000) 84 Cal.App.4th 100 [100 Cal.Rptr.2d 649], this court held SSA's abject failure to attempt to locate the mother so as to give her notice of the six-month review hearing where reunification services were terminated was reversible per se. (*Id.* at p. 110.) Following the lead of *DeJohn B.*, another panel of this court issued *In re Jasmine G.* (2005) 127 Cal.App.4th 1109 [26 Cal.Rptr.3d 394]. In *Jasmine G.*, SSA never attempted to give the mother notice of a selection and implementation hearing where her parental rights were terminated, despite knowing her address and having repeated contact with her before the hearing. The court found the failure to give notice of a selection and implementation hearing "denies a parent the opportunity to confer with her attorney, prepare her case, or defend against the loss of parental rights.

Without [notice], we cannot say the loss of parental rights—or the hearing—is fundamentally fair." (*Id.* at p. 1116.) The court held the error was reversible per se. (*Ibid.*)

The failure to provide a status report in accordance with the statute was held to be structural error requiring automatic reversal by the Second Appellate District in *Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535 [126 Cal.Rptr.2d 14]. There, the court terminated reunification services at the 12-month review hearing in accordance with the recommendations of the social worker contained in the status report although neither the mother nor her counsel was served with a copy of the report until the morning of the hearing. The court stated, "[T]he impact of having less than the statutorily mandated minimum time within which to (1) confer with one's lawyer, (2) contact witnesses, (3) obtain documents, (4) prepare for examination and cross-examination, and (5) hone one's arguments, is impossible for either a trial court or an appellate court to assess. Thus, these factors indicate that the error is [structural] error." (*Id.* at p. 557.)

More recently, however, the California Supreme Court has cautioned against using the structural error doctrine in dependency cases. In *In re James F.* (2008) 42 Cal.4th 901 [70 Cal.Rptr.3d 358, 174 P.3d 180], the Supreme Court explained that the concept of structural error was developed in criminal cases: "In *Arizona v. Fulminante*[ (1991)] 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246], a criminal case in which the erroneous admission into evidence of a defendant's coerced confession was at issue, the United States Supreme Court distinguished constitutional errors called ' "trial errors" ' that 'occur[] during the presentation of the case to the jury' and the effect of which can 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt' [citation], from other, less common constitutional errors that are 'structural defect[s] affecting the framework within which the trial proceeds' so that they 'defy analysis by "harmless-error" standards' and can never be harmless [citation]. Structural defects requiring automatic reversal of a criminal conviction typically involve basic protections without which ' "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." ' [Citations.] These include total deprivation of the right to counsel, denial of the right of self-representation, trial before a judge who is not impartial, unlawful exclusion of members of the defendant's race from a grand jury, and denial of the right to a public trial. [Citation.] Admission of an involuntary confession by the defendant, the high court concluded, was a trial error subject to harmless error analysis. [Citation.]" (*Id.* at p. 914.)

The *James F.* court pointed out significant differences between juvenile dependency proceedings and criminal proceedings. "In a criminal prosecution, the contested issues normally involve historical facts (what precisely occurred, and where and when), whereas in a dependency proceeding the issues normally involve evaluations of the parents' present willingness and ability to provide appropriate care for the child and the existence and suitability of alternative placements. Finally, the ultimate consideration in a dependency proceeding is the welfare of the child [citations], a factor having no clear analogy in a criminal proceeding." (*In re James F., supra,* 42 Cal.4th at p. 915, italics omitted.)

The issue in *James F.* was whether the juvenile court's error in the procedure used to appoint a guardian ad litem for the father in a dependency proceeding required automatic reversal of an order terminating the father's parental rights or whether instead the error was subject to harmless error review. The juvenile court failed to explain to the father the capacity and powers of a guardian ad litem nor did it provide the father a meaningful opportunity to voice opposition to the appointment. There was no dispute that the process by which the guardian ad litem was appointed did not satisfy due process. Nevertheless, the court found that the juvenile court's due process error was not structural. The court noted that the result achieved in the case was correct and fair because the father was never ready to assume custody of his son. It found it appropriate to use a harmless error analysis because, unlike structural error, prejudice could be determined without " 'a speculative inquiry into what might have occurred in an alternate universe.' [Citation.]" (*In re James F., supra,* 42 Cal.4th at p. 915.) The court concluded: "If the outcome of a proceeding has not been affected, denial of a right to notice and a hearing may be deemed harmless and reversal is not required. [Citation.]" (*Id.* at p. 918.)

■ The case before us is also amenable to a harmless error analysis. Mother had been provided reunification services for more than three years. During the year preceding the January 2011 hearing, she failed to participate meaningfully in her case plan or maintain contact with the social worker. There is no basis on which the juvenile court could have found more services would have been in A.D.'s best interests. The permanent plan of long-term foster care will allow A.D. and mother to stay in contact while providing stability and reassurance for the child.

We briefly address mother's argument that the juvenile court denied her statutory and due process right to a contested hearing. Mother's right to a contested hearing without first making an offer of proof is firmly established. (*David B. v. Superior Court* (2006) 140 Cal.App.4th 772, 779 [44 Cal.Rptr.3d 799].) But mother failed to appear until after the hearing had concluded.

Mother's counsel did not seek a continuance of the hearing, and the court was presented with a valid stipulation on which it based its finding. The notice defect was not the cause of mother's tardy appearance. While the juvenile court had the power to vacate its orders (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 111 [50 Cal.Rptr.3d 208]), there is nothing in the record to indicate its refusal to do so was an abuse of discretion.

## DISPOSITION

The orders are affirmed.

O'Leary, J., and Moore, J., concurred.