Filed 11/6/13  In re M.D. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| In re M.D. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.N.,<br><br>Defendant and Appellant. | A137672<br><br>(San Francisco City and County Super. Ct. No. JD12-3185) |

At a six-month review hearing, the juvenile court found that S.N.'s children were at substantial risk of detriment if returned to her custody.  (Welf. & Inst. Code, § 366.21, subd. (e).)[1]  S.N. appeals, arguing that the juvenile court's finding is not supported by substantial evidence.[2]  We affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petition*

The initial section 300 petition, filed by the Los Angeles Department of Children and Family Services (DCFS), alleged that M.D., Z.D., and Luke D. (the children) were at risk of serious physical harm (§ 300, subd. (a)) because their parents, S.N. (mother) and

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] The children's presumed father, Marvin D., is not a party to this appeal.

Marvin D. (father), had a history of engaging in physical violence in front of them.[3] Specifically, it was alleged that, on January 25, 2012, father pushed mother onto a bed, grabbed her hair, hit her in the face with his hand, and scratched her cheek and chest. The petition also alleged that mother used excessive physical discipline against M.D. and Luke; hitting their heads and bodies with her hand and a plastic bat. Mother also reportedly pinched and scratched M.D.'s neck, leaving scratch marks.

*Detention Report and Hearing*

The detention report indicated that five-year-old Luke was present, on January 25, 2012, when father picked up a potted plant, threw it at mother, pushed her on the bed, grabbed her by the neck, and proceeded to punch her in the face with a closed fist. At the time, mother reported that there had been 10 other incidents of domestic violence. In an earlier 2008 incident, father sustained scratches to his face and back of his head after he and mother got into a physical altercation. Mother was arrested due to the injuries sustained by father, and was also accused of having pulled M.D.'s hair.

When interviewed by a social worker, the children confirmed that mother spanked with both an open hand and closed fist, and sometimes with a plastic bat or belt. M.D. had been previously "choked" by her mother, sustaining bruises and scratches on her neck. The children also confirmed that they saw their parents yelling and hitting each other.

Mother admitted that she spanked the children, but claimed it was not abuse. She also admitted scratching M.D., but maintained it was accidental. According to mother, M.D. was prone to misinterpreting things due to having had encephalitis as a small child. Both parents admitted to a history of domestic violence but denied that it was an ongoing issue. The social worker concluded: "The parents' extensive history of domestic violence in the home poses an imminent danger of serious physical and emotional harm to the children. [¶] Several safety factors are present, and placement is the only protective intervention possible for [the] children."

---

[3] Allegations under section 300, subdivisions (b) and (j), were also made and later dismissed.

On April 24, 2012, the juvenile court ordered the children detained in the maternal great uncle's care. At the time of detention, DCFS recommended that mother undergo domestic violence awareness counseling, individual/family counseling, anger management counseling to address the physical abuse of the children, parenting classes, and a psychological/psychiatric evaluation with follow-up treatment as recommended.

*Jurisdiction/Disposition Report and Determination*

By the time the jurisdiction report was filed in May 2012, the children claimed that they had been hit with a belt, but had never been hit with a plastic bat. Instead, both M.D. and Z.D. claimed that they had been playing with bats and hit themselves. M.D. also confirmed that her parents yell, curse, and fight in front of her, and recalled an instance where father shoved mother into a wall. M.D. recalled seeing mother clean up blood from her arm. Luke reported that " '[his] mom closed the trunk on [his] sister's fingers on purpose' " and then " 'walked away.' " Mother's former roommate also informed a social worker that she personally witnessed mother hitting the children, specifically recalling that she saw mother smack Luke in the face on a few occasions.

Mother admitted spanking and using a plastic bat to discipline the children. But, she said " '[i]t's not abuse in my mind' " because it was " 'one tap or two taps' " and " 'it wasn't on the face.' " She denied hitting the children anywhere in the rib cage area. Father told the social worker that he " 'step[ped] in' " as needed to " 'make sure [mother] does not get carried away' " when disciplining the children.

Although mother once claimed that father hit her during the January 2012 altercation, she now claimed that she hit herself during the scuffle. Mother explained that the parents remained living together, between January 2012 and April 2012, because it was " 'ridiculous' " to obtain a permanent restraining order because she believed father needed to interact with the children.

At the May 31, 2012 hearing, Mother pleaded no contest to the jurisdictional allegations and dependency was declared pursuant to section 300, subdivision (a). Mother was ordered to participate in individual counseling with an approved counselor addressing "parenting" and "domestic violence." Mother was also ordered to engage in a

3

domestic violence support group for victims, to take a parenting class, and to verify a sober and stable lifestyle. The court further ordered that mother "sign any form necessary to release information to DCFS with regard to all court ordered counseling," and that there would be "no corporal punishment" inflicted on the children. After the detention order, the children had moved to San Francisco to live with their maternal grandmother, and mother had moved to San Francisco as well. Accordingly, the juvenile court ordered the children removed from parental custody, placed them in the home of the maternal grandmother and transferred the case to San Francisco.

Upon assuming jurisdiction, the San Francisco Superior Court ordered that the care and custody of the children rest with the San Francisco Human Services Agency (Agency). The children continued to reside with their maternal grandmother.

*Request to Change Court Order*

On August 2, 2012, mother filed a request to change a court order seeking permission to move into the maternal grandmother's home and reside with the children, or have unmonitored visits, or have the children placed in her home. Mother reported that she was no longer in a relationship with father, had completed a six-hour parenting course, was attending individual therapy, and took care of the children's daily needs in a supervised setting. The court set the petition for a hearing.

On August 3, 2012, an interim review report acknowledged that mother had completed a six-hour parenting class. However, the social worker did not believe that a six-hour class was sufficient to address the 11-year domestic violence relationship between mother and father and the effects of that violence on the children. Mother's request for a parent education program that could be completed in a day because she " 'want[ed] to get it over with' " indicated to the social worker that mother was only superficially fulfilling her requirements, and not taking the opportunity to gain insight and understanding into how her violent relationship with father was emotionally harmful to her children. Mother continued to deny that the children actually witnessed any domestic violence. The report also noted that mother refused to participate in a domestic

4

violence support group.  Mother also refused to acknowledge that she was violent because she believed only "people who did not go to college are violent."

Mother was participating in individual therapy, but between May and July, had missed three sessions.  Her therapist opined that mother was still in denial and was minimizing the effects of domestic violence on the family.  Mother also did not appear to understand the trauma that the children endured through the years of domestic violence, or that the children could still be negatively affected by the tension, conflict, and arguments between the parents even if they were not in the immediate vicinity of domestic violence.  The Agency recommended that mother's petition be denied and the matter continued to the six-month review hearing.

On September 4, 2012, mother requested a restraining order against father, based on allegations that he was stalking her and leaving messages threatening to kill and mutilate her.  She also based the request on the couple's history of domestic violence, describing incidents from 2011 and early 2012.  The court granted a temporary restraining order on September 5, but mother unilaterally withdrew the restraining order application at the September 17, 2012 hearing on her petition for a change of court order.  At that hearing, the parties also stipulated for mother to have unsupervised day visits and two overnight visits per week at the grandmother's home.

*Six-Month Review*

On November 9, 2012, the Agency filed a status review report, which acknowledged that mother completed a parenting class and a psychological evaluation, with test results still pending.  Mother told the social worker that "[she] realized that it was not appropriate for her to even tap the children with a plastic bat in the past."  Instead, she now used praise and a point system to reward good behavior.  Mother also told the social worker that she now recognized that she does not need to be in a relationship with someone who does not treat her well.  However, Dr. Amy Watt, the psychologist who performed mother's evaluation, informed the social worker that mother was in denial and minimized the domestic violence.  Mother also refused to deal with any anger issues and presented with much grandiosity.

5

The report further noted that mother began individual therapy with Desdemonia Whittle at the end of August 2012. Whittle stated that mother was in denial regarding her anger, refused to admit that she has negative emotions, and instead believed that she was a happy person. Mother also refused to believe that therapy was necessary. Whittle opined that mother was only attending therapy to fulfill her requirements to regain custody of the children. The therapist expressed concern regarding mother's denial as well as her lack of insight into her financial condition. In particular, the therapist was apprehensive of mother's plan to move back to Los Angeles and hire an au pair for the children.

Mother had been visiting the children consistently and had completed a series of parenting classes, in which she was an active participant. Mother also completed a domestic violence counseling program, but according to the case manager, mother did not identify herself as a victim of domestic violence, instead asserting that she was in control of the relationship. Thus, she did not actively participate in the support group. Further, mother stated that she ended the relationship with father not because she cared for the safety of her children, but because he did not have sufficient money for her. Mother also believed that, when she moved back to Los Angeles, father would likely follow the family.

Based on the above information, the social worker opined that mother had been participating "consistently" in her case plan, but failed to fully comprehend the reasons for the court's involvement, the effects of domestic violence on her and her children, or the purpose of the reunification services. Mother's attitude indicated that she had an unrealistic perception of reality. The social worker acknowledged mother's love for the children, but opined that reunification was premature. Accordingly, she recommended an additional six months of services to allow mother to continue her participation in court-ordered services.

On January 9, 2013, the Agency filed an addendum report. Since the last report, Z.D. reported that he had seen mother push M.D. Mother denied the incident. Mother also unilaterally discontinued therapy sessions with Whittle after only 12 sessions.

6

Whittle said she confronted mother about her refusal to meaningfully engage in therapy, and mother responded by stating she "does not have any problems, but solutions." Mother also inquired of the social worker about when she could stop attending therapy.

As a result of her psychological evaluation, mother was diagnosed with depressive disorder not otherwise specified, histrionic personality disorder, narcissistic personality disorder, poor insight, and poor reality testing.[4] Dr. Watt wrote that mother's "high degree of self focus and her unrealistic perception of what is happening around her makes it difficult to attend to the needs of her children." Throughout the evaluation, mother also repeatedly claimed to be "peaceful" and denied ever being angry or hitting anyone.

Dr. Watt observed that mother minimized the seriousness of the domestic violence between her and father, and spoke little of her role in the conflict. According to the psychologist, mother also presented with a high level of grandiosity and narcissism, conveying an image of being well-off and successful, even though the records do not support such an impression. Dr. Watt opined that test results indicate a "significantly high level of defensiveness and denial of problems" and that mother "tends to minimize any negative impact that her actions may have on other people and on herself." Dr. Watt concluded that "[a]s [mother] does not believe there are any problems in the family, she is unlikely to seek help or accept help offered to her." In addition, mother's decision to

---

[4] Mother argues that the psychological evaluation attached to the addendum report should not have been admitted into evidence over her objection that it was untimely. (See § 366.21, subd. (c) [requiring status report to be filed and served at least 10 calendar days before hearing]; *Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535, 539–540, 558 (*Judith P.*) [holding failure to serve status report until morning of hearing constituted structural error compelling reversal and remand of trial court's order].) Even if we assume that *Judith P.* is still good law (see *In re Celine R.* (2003) 31 Cal.4th 45, 58–59 [critiquing analogy to criminal structural error doctrine]), its holding only "mandates that any party to a dependency proceeding who did not receive the status report at least 10 days before a prepermanency planning review hearing *must be granted a continuance or must expressly waive his or her right to the timely service of such report*." (*Judith P.,* at p. 558, italics added.) Here, however, after objecting to the late report, mother rejected the trial court's offer to continue the hearing. *Judith P., supra,* 102 Cal.App.4th 535 did not hold that an untimely report should be excluded from evidence in such a situation.

"maintain an ongoing conflict laden relationship with the children's father" is also "detrimental to the children's emotional development."

The Agency continued to recommend additional services before reunification. The social worker wrote: "Returning the children to either [parent's] care and home is contrary to their well being and best interests because (1) [neither] parent has . . . completed their reunification services case plan; (2) their current status is still unstable regarding . . . housing, employment; (3) there [are] still concerns about the mother's ability to put the children's needs before hers; (4) there are still concerns about the parents not involving the children in their domestic violence relationship; and (5) there are still concerns about whether the parents will use [the] children to manipulate each other."

At the contested six-month review hearing, held on January 15, 2013, the social worker testified that mother had completed some, but not all, of the reunification requirements. The social worker testified that mother began individual therapy in May 2012, but unilaterally discontinued it in December 2012. Thus, mother did not complete the individual therapy component of her case plan. Mother's counsel represented that mother was seeking a new therapist, but the social worker had been unable to obtain any information from the new therapist.

Mother completed the domestic violence support group component of her plan, as well as the parenting class. Although mother was able to articulate her understanding that it was important to keep the children safe and free from domestic violence, it was the social worker's opinion, based on her personal observations and discussions with mother's therapist, case manager, and psychologist, that mother had not gained sufficient insight into her domestic violence history.

Mother testified on her own behalf. She described her visits with the children and provided testimony on what she learned in parenting classes, therapy, and the domestic violence support group. She admitted, however, that she never received any letter or certificate indicating that she completed the therapy component of her reunification plan.

8

Mother admitted that her relationship with the father was violent for at least the last five years, that the police were called on at least four occasions, and that the children witnessed two of these altercations. Mother also admitted that in one of the altercations that the children witnessed, she was arrested and was a mutual combatant in the violence. Mother initially claimed that she learned to control her temper in the parenting class, but later denied that she had any anger issues.

At the conclusion of the evidence, the juvenile court found that conditions still existed justifying the court's assumption of jurisdiction, and further found that returning the children to their mother's physical custody would create a substantial risk of detriment to their safety, protection, emotional or physical well-being. The court explained: "[N]either parent has completed their reunification requirements. There has been progress, and I want to acknowledge that and not lose sight of it. But in light of this history of domestic violence in this case, and the evaluator's report . . . that mom is going through the motions, that is troublesome to me, and I think that more services are needed." The court ordered an additional six months of services, with the goal of returning the children home at the next review hearing. Mother filed a timely notice of appeal.

## II. DISCUSSION

On appeal, mother challenges only the juvenile court's detriment finding and argues that it is unsupported by substantial evidence. We disagree.

At the six-month review hearing, the juvenile court is required to return the dependent child to the parent's physical custody unless it finds, by a preponderance of the evidence, that return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. . . . The failure of the parent . . . to participate regularly and make *substantive progress* in court-ordered treatment programs is prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; and shall consider the efforts or progress, or both,

9

demonstrated by the parent . . . and the extent to which he or she availed himself or herself to services provided . . . . [¶] Regardless of whether the child is returned to a parent . . . , the court shall specify the factual basis for its conclusion that the return would be detrimental or would not be detrimental." (§ 366.21, subd. (e), italics added.)

We review the substantial risk of detriment finding for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763; *In re Shaundra L.* (1995) 33 Cal.App.4th 303, 316.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947; accord, *In re J. I.* (2003) 108 Cal.App.4th 903, 911.)

"The standard for showing detriment is 'a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.] Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being. [Citations.] [¶] In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement. [Citations.]" (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) A parent is not required to demonstrate perfect compliance with a case plan. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343.) "[T]he question whether to return a dependent child to parental custody is not governed solely by whether the parent has corrected the problem which required court intervention; rather, the court must consider the effect such return would have on the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 894.)

Mother argues that she "not only substantially complied with her case plan, but there was no identified risk of harm to the children if they were returned to [her] custody . . . ." Mother completed the parenting class and domestic violence support group components of her case plan. However, mother unilaterally discontinued her individual therapy. Mother relies on *Jennifer A. v. Superior Court, supra,* 117 Cal.App.4th at pages 1344–1345, but here, unlike the circumstances of that case, mother's imperfect compliance with her case plan is directly linked to the issues that brought the children into the dependency system. And, even if mother had technically complied with her case plan, that alone would not answer the detriment question. (*In re Yvonne W., supra,* 165 Cal.App.4th at p. 1400; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142 ["[a]vailing herself of the services provided is one consideration . . . but . . . the court must also consider progress the parent has made towards eliminating the conditions leading to the children's placement out of home"].) Mother's actions, as well as the reports from her therapist and the psychological evaluator, reveal that mother failed to demonstrate adequate progress towards ameliorating the conditions that caused the children's removal in the first place—domestic violence and excessive physical discipline.

For example, despite mother's and father's long history of domestic violence and mother's participation in a domestic violence support group, mother continued to minimize the issue and failed to follow through with a restraining order when father purportedly stalked and threatened her. And, despite her completion of several parenting classes, there was evidence that mother had pushed M.D. during a visit and denied having any anger problem.[5] The juvenile court's detriment finding is supported by substantial evidence.

---

[5] Mother attempts to discredit this evidence by suggesting that Z.D., who reported the pushing incident, has "a known tendency to lie." She also points out that the social worker did not adjust mother's unmonitored visitation after the report. However, we cannot dismiss this evidence without ignoring the standard of review. (See *In re L. Y. L., supra,* 101 Cal.App.4th at p. 947 ["we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the

11

*In re Yvonne W., supra,* 165 Cal.App.4th 1394 does not compel a contrary conclusion. In that case, the reviewing court concluded a detriment finding was unsupported by substantial evidence when the mother "did everything [the social services agency] asked of her, including eliminating the conditions that led to [the child's] out-of-home placement." (*Id.* at p. 1401.) This case is distinguishable, in that mother did not comply with every aspect of her reunification plan. And, the juvenile court could reasonably conclude that mother was merely making superficial efforts and had not eliminated the conditions that caused the children's removal.

Mother's reliance on *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 is similarly misplaced. In that case, the reviewing court criticized the juvenile court's reliance on vague statements by the social worker that the mother had failed to " 'internalize' " parenting skills. (*Id.* at p. 1751.) The detriment finding was made in reliance on the fact that the mother and the father continued to deny molestation allegations, even though those allegations had since been discredited by an expert. (*Id.* at pp. 1741–1744, 1752–1753.) In contrast, here, the truth of the domestic violence and physical abuse allegations has not been questioned. Furthermore, there was evidence of mother's actions, in addition to statements by the social worker, therapist, and psychological evaluator, which demonstrated that mother had not made sufficient progress in eliminating the underlying problems.

## III.   DISPOSITION

The juvenile court's order is affirmed.

---

order if supported by substantial evidence even if other evidence supports a contrary conclusion"].)

_____
Bruiniers, J.

We concur:


_____
Jones, P. J.


_____
Needham, J.