Filed 3/23/15  In re R.G. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re R.G. et al., Persons Coming Under the Juvenile Court Law. | B257710 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.T.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK94347) |

APPEAL from orders of the Superior Court of Los Angeles County. Teresa Sullivan, Judge.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Merrill Lee Toole, under appointment by the Court of Appeal, for Minors.

* * * * * * * * * *

This is the second time this family has come before us. On November 13, 2014, we granted mother's petition for an extraordinary writ, which challenged an order terminating reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(15)[1] for mother's youngest child, V.T. (*D.T. v. Superior Court* (B257555) [nonpub. opn.].) In that opinion, we concluded that the juvenile court abused its discretion when it denied mother's request for a continuance of the disposition hearing as to V.T. after minor's counsel suggested (for the first time at the hearing) that reunification services to mother should be bypassed under the "parental abduction" provision of section 361.5, subdivision (b)(15).

Mother now appeals the juvenile court's dispositional orders as to her older three children, J.M., S.G., and R.G., terminating dependency jurisdictional with family law orders granting sole legal and physical custody to the children's fathers under section 361.2. Mother contends she received inadequate notice of the dispositional hearing because the Los Angeles County Department of Children and Family Services (Department) filed (and the juvenile court considered) an untimely report changing its recommendation, and newly recommending that jurisdiction be terminated with a family law order. Mother also contends the juvenile court abused its discretion when it denied her request for a continuance of the hearing on this basis. Lastly, mother contends that insufficient evidence supports the juvenile court's order denying mother reunification services under section 361.5, subdivision (b)(15), and that reunification was in the children's best interests.

Finding no merit in any of these contentions, we affirm the orders below. Mother received adequate notice that jurisdiction could be terminated with a family law order at the disposition hearing, and in any event, she was not prejudiced by the order. Mother's poor participation in reunification services and failure to cooperate with the Department demonstrates that any error was necessarily harmless. Moreover, we need not address the

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

juvenile court's findings under the reunification bypass statute, section 361.5, subdivision (b)(15), as those findings related only to mother's youngest child, V.T., who is not at issue in this appeal. Lastly, we find the juvenile court did not abuse its discretion when it declined to order additional reunification services for mother under section 361.2.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

On September 18, 2012, the family came to the attention of the Department following a "caretaker absence" referral for then four-year-old J.M., six-year-old S.G., and eight-year-old R.G. Mother had driven drunk to McDonald's with the children in the car, and had not restrained them in appropriate car seats. Mother dropped the children off at the McDonald's play area, and then crashed into the restaurant. Mother then got into a physical altercation when a witness tried to take her keys away. Mother was arrested for driving under the influence, with a blood alcohol level over twice the legal limit. She did not tell arresting officers that her children were at the restaurant because she " 'did not want [her] kids to be taken away. . . .' " Instead, officers later received an anonymous call that the children had been left at the restaurant. The children were unattended at the restaurant for approximately 2½ hours before they were taken into protective custody by the sheriff's department.

When interviewed by the Department, mother admitted to drinking five beers before driving the children to McDonald's. She denied having a drug or alcohol problem, but admitted to drinking approximately eight beers per week.

The children were released to J.M.'s father, T.M., who had been mother's live-in boyfriend until the two had separated several months earlier. He "absolutely" wanted all

---

[2]     We note at the outset that mother appears to be under the misapprehension that the juvenile court terminated her reunification services under section 361.5, subdivision (b)(15), and mother's appellate briefs completely fail to discuss the applicable provision, section 361.2. Nevertheless, to the extent we can, we review the merits of her contentions.

three children placed with him. T.M. denied that mother used drugs, but agreed that she did drink alcohol. The whereabouts of R.G.'s and S.G.'s father were unknown.

R.G. told the Department social worker that T.M. "is like our dad." She did not have a relationship with her father. R.G. denied any physical or sexual abuse, and reported that mother disciplined her with time-outs. S.G. also denied any physical abuse or inappropriate discipline. Neither child had seen mother use illegal drugs. J.M. cried for mother, and refused to speak with the social worker.

At the September 24, 2012 detention hearing, the juvenile court ordered the children detained with T.M. Mother was ordered to receive monitored visitation. The juvenile court also ordered that R.G.'s and S.G.'s paternal grandmother be assessed for placement, in case placement with T.M. did not work out. Mother was referred to drug and alcohol testing and counseling. T.M. was found to be the presumed father of J.M., and S.G., Sr. (who had been located) was found to be the presumed father of R.G. and S.G.

S.G., Sr., told the Department that he and mother had not been involved for "a while." She started drinking heavily when they separated. S.G., Sr., worked at a truck stop in North Dakota. He admitted to using marijuana as a juvenile, but had no other drug history. He wanted his children placed with him in North Dakota.

Mother reported that her relationship with S.G., Sr., ended when she caught him using methamphetamine around the children. After they separated, S.G., Sr., had no interest in maintaining a relationship with R.G. and S.G. Mother soon started a relationship with T.M. She and T.M. had been separated for the last five months, but were still in contact over their child, J.M. They had argued in the past, but did not have a history of domestic violence.

Mother admitted she made a "big mistake" and she wanted her children back. Mother had been convicted of misdemeanor drunk driving, and received three years probation. She was in compliance with her MADD program, community service program, and traffic program ordered by the criminal court.

Father T.M. reported that he was employed by a heating and cooling company, and that his work often takes him out of the area for several days at a time. He and mother had dated for six years, and were currently "taking a break to figure out what they want." Father told the Department that mother made a mistake, and that the children should be placed with her.

The older children, R.G. and S.G. told the Department they wanted to live with their mother, while J.M. told the Department "I live with my daddy." R.G. and S.G. had not seen their father in year, and they did not want to be placed with him.

On October 29, 2012, mother completed a waiver of rights and plead no contest to the allegations of the petition concerning the drunk driving incident. The juvenile court ordered mother to participate in random and on demand drug testing, and to enroll in parenting and individual counseling. The children were ordered to remain with T.M.

Mother tested negative for drugs on November 6, 2012.

The disposition hearing on the original petition was held on November 26, 2012. The children were returned to mother under Department supervision. Mother was ordered to make the children available for unannounced home visits, and to keep the Department advised of her telephone number and address. Mother was ordered to submit to random and on-demand drug and alcohol testing, to participate in parent education and individual counseling, and to comply with all orders of the criminal court, including completing an AA program. The court also ordered that only the children, mother, and maternal grandfather were permitted to live in the family home, and that no alcohol was to be kept in the home.

A May 28, 2013 status review report noted that on January 16, 2013, the Department had been advised that R.G. could not remain at school because she was infested with lice. The school had offered mother boxes of lice treatment, but mother declined them, saying she already had some. The Department admonished mother to address the lice issue, and on January 30, mother assured the Department that R.G.'s lice problem had been remedied. However, on February 1, the Department learned from R.G.'s school that she still had lice. When a Department social worker met with mother

5

and the children on February 13, mother said she had purchased shampoo and spray to treat the infestation.

On April 26, 2013, R.G.'s school reported that R.G. was wearing a hood over her head to hide the lice, and the school's nurse noted that she was still suffering from a lice problem.

A Team Decision Making meeting was held on May 7, 2013, to address case issues, including the persistent lice problem. A public health nurse inspected the children and discovered that R.G. and J.M. had lice. Mother was told how to treat the problem, and the school nurse agreed to give three boxes of RID to mother. It was agreed that the Department would apply for a removal warrant for the children if the lice problem was not resolved by May 28, 2013.

There were also school attendance problems. On March 4, 2013, mother was supposed to attend the Abolish Chronic Truancy Program and meet with the District Attorney regarding the children's school attendance, but mother failed to show up.

R.G.'s teacher sent the Department a letter on May 7, 2013 noting that R.G. was often "extremely disheveled." Her shoes were torn and her glasses had been broken for several months. R.G.'s academic progress was also poor because she had missed 30 days of school. R.G.'s teacher noted that R.G. continued to have lice, and would often hide her head with a hood.

S.G.'s teacher reported that S.G. was performing poorly in all academic areas, and "no longer seems to care." He had missed 29 days of school, never had his homework assignments completed, and received failing grades on most assignments. S.G. reported that mother did not read with him at home.

On April 12, 2013, mother completed a nine-week parenting course at Youth Support Association. Mother had also started counseling at Tarzana Treatment Center, but withdrew because she did not believe it was benefitting her. Mother intended to enroll in another counseling program.

The Department told mother to get medical and dental checkups for the children, but mother failed to do so, claiming she did not have their Medi-Cal cards. However, the

6

Department of Social Services confirmed that mother received Medi-Cal cards that had been issued to her four months prior. The children had last seen the dentist in August 2012. Mother had also refused to have R.G. and S.G. participate in mental health assessments to determine if they qualified for services.

Mother tested negative for drugs on November 6 and 26, December 5 and 13, 2012; and January 8 and 23, February 13 and 25, March 8 and 21, and April 12 and 23, 2013.

Father S.G., Sr., had not visited with the children at all, and according to mother, T.M.'s visits were inconsistent.

On May 17, 2013, the public health nurse reported that the children had not missed any more school, and that the school nurse had cleared them for lice.

The Department was concerned because mother appeared depressed, especially about her relationship with T.M., and her belief that the relationship had worsened since the Department's involvement with the family. She did not take any responsibility for the lice problems, her inability to meet the children's medical and dental needs, or their educational problems. She admitted to needing help, but seemed "defeated" and "unmotivated to improve her situation." The Department recommended that mother receive another six months of family maintenance services to allow her to complete counseling, AA, and her ABC Traffic Program.

At the May 28, 2013 hearing, the court ordered that the children remain with mother, and that the children receive referrals for individual counseling.

The Department's August 26, 2013 Status Review Report noted that mother had missed two drug tests in June and one in July. A July test was diluted. However, mother did submit two negative tests in July. Mother had also failed to execute a release so the Department could receive updates on her progress with the ABC Traffic Program that had been ordered by the criminal court.

The children and mother received mental health assessments on July 23, 2013, and it was determined that the children did not require mental health services. Mother,

7

however, received a referral for individual counseling. Nevertheless, mother had not enrolled in counseling.

Mother claimed to have made medical and dental appointments for the children in August 2013, at the Antelope Valley Community Clinic. When the Department followed up with the clinic it learned that dental appointments had been made, but no medical appointments had been scheduled.

S.G., Sr., traveled to California to visit with the children in May, and R.G. and S.G. enjoyed the visit. T.M.'s visits with J.M. had been inconsistent.

The Department was concerned that mother appeared depressed, and had not started counseling. R.G. and S.G. were once again infested with lice. Mother was not addressing the children's medical and dental needs, and appeared "defeated" and "unmotivated." The Department recommended that mother continue to receive family maintenance services.

At the August 26, 2013 hearing, the court ordered that all reports must be filed two days before the court hearing. The court also ordered mother to take the children to the doctor to address their lice problem.

The Department's October 21, 2013 interim review report noted that R.G. missed a total of 38 days of school during the 2012-2013 school year, which included 22 unexcused absences. During the first five weeks of the 2013-2014 academic school year (which started on August 12, 2013), R.G. missed three days of school (two of which were excused) and left early on four days. R.G. was working below grade level in language arts, math, social studies, and science, and was reading below grade level. She had failing grades in most subjects. Although mother had signed R.G.'s planner, indicating that her assignments had been completed, R.G.'s teacher had never received any homework assignments from R.G. R.G.'s teacher made numerous requests for conferences with mother, but received no response. R.G.'s report card for the 2012-2013 academic year reflected poor grades, including two F's, a D, and a C. The excessive absences and missed assignments were negatively affecting R.G.'s grades.

S.G. missed 35 days in the 2012-2013 school year, 26 of which were unexcused. He had one excused absence in the first five weeks of the 2013-2014 academic year, and left early on four days. His grades for the 2012-2013 school year consisted of three D's, one B, and one C. Excessive absences and missed assignments affected his grades.

J.M. had just entered kindergarten.

A public health nurse examined the children for lice on August 20, 2013, and saw lice eggs on all three children. The nurse advised mother to treat the children, and mother stated she had shampoo at home.

The children were examined again for lice on October 10, 2013. There were visible eggs on all three children, and the children denied that mother had shampooed their hair or taken them to the doctor.

Mother continued to miss drug tests, and did not return phone calls from the Department. When she met with a Department social worker on September 24, 2013, mother explained that her father was diagnosed with stage 4 cancer, and his diagnosis was the reason she was missing tests and not returning calls. However, mother had been unresponsive and missed tests *before* her father's diagnosis. Mother tested negative on August 21 and September 19, but was a no-show for three tests in September 2013.

On September 24, the Department social worker found the children's bedroom to be in "deplorable" condition. The room smelled of urine, and the bedspread and linens were dirty. Mother said that one of the children wets the bed, and that she would buy new mattresses. The bathroom was also dirty, with trash strewn all over the floor. Maternal grandfather's bedroom, where S.G.'s bed was located, was locked, and could not be inspected. The Department agreed to provide a homemaker to help mother.

It was also noted that R.G. and S.G. often wore dirty clothes to school, and had to be sent to the restroom to wash their hands and faces because they were so dirty.

The Department recommended that the case remain open to address the lice and educational issues.

At the October 22, 2013 hearing, the court ordered the Department to send a public health nurse to mother's home to assess the lice problem. The public health nurse was to bring medication and show mother how to use it if the problem persisted.

The Department's December 9, 2013 interim review report noted that mother had given birth to a baby girl, V.T., on October 31, 2013. The Department reported that policy prohibited a public health nurse from distributing or administering medicine as ordered by the court. The public health nurse was willing to do a home visit, but believed that mother had already received extensive instruction on how to eliminate the lice problem. A public health nurse visited with the children at Department offices on November 12, 2013, and noted visible lice eggs. Maternal aunt, who was present at the meeting, said she would ensure that the children were treated.

At the December 9, 2013 hearing, the court ordered the Department to report on the lice situation.

The Department's April 17, 2014 detention report noted that a petition as to mother's new child, V.T., was sustained on February 5, 2014, based on mother's unresolved history of substance abuse (because of her failure to engage in treatment or to drug test), and the fact that V.T.'s older siblings were dependents of the court. The Department had received a referral concerning V.T. on January 14, 2014. Mother had given birth to her at home, and had not sought medical attention until the day after her birth. Mother had also not received prenatal care for V.T. Mother claimed she did not know she was pregnant, but then inconsistently claimed to have been unable to comply with her case plan *because* she was pregnant. Moreover, V.T. had been diagnosed with respiratory problems but mother had missed several follow-up appointments.

At the February 5 jurisdictional hearing on the petition as to V.T., mother was ordered to submit to weekly drug testing, and to complete a full treatment program if she had any missed or dirty tests. Mother was also ordered to participate in individual counseling, and to attend AA and comply with any criminal court orders.

On February 26, 2014, mother had confirmed she received a referral packet from the Department, and she signed an acknowledgement confirming that she understood her case plan and what was required to reunify with her children.

Since the December 2013 court hearing, mother's drug testing had become even more erratic. Of the seven tests ordered over the months of December, January, February, and March, mother only tested on January 15, 2014, with negative results.

Maternal grandfather had died, and it appeared that multiple people had moved into the family home notwithstanding the court's order that only mother, the children, and maternal grandfather reside in the home.

On March 12, a social worker attempted to visit mother at her designated address. A maternal uncle told the social worker that mother and the children were in the house, however, a young man named Arthur, who arrived at the home in maternal grandfather's car, claimed mother and the children were at the store. On March 18, mother and the children were not at home, and a young man with a pit bull said they were at the store. Arthur was seen in the home lying on the sofa.

On March 20, a Department social worker visited the children's school, and was informed that the children were no longer attending, and had moved to another elementary school. The social worker was able to locate the children at their new school. S.G. reported that they were sleeping in the living room, and were living with their cousin, Trish. His hair was neatly combed and his attire was "fair." J.M. was in dirty clothes with uncombed hair. She said they had moved in with their cousin, and all slept together. S.G. would wet the bed, and as a result, J.M.'s pants got wet. According to J.M., maternal grandmother lived in maternal grandfather's home with J.M.'s uncle and cousins (the home which was listed with the Department as mother's address). R.G. also reported they had moved in with their cousin. R.G. said mother would go out at night and leave the children. Maternal grandmother had "put them out." R.G. said they were going to stay with maternal grandmother during the school break. R.G. had a poor appearance, with dirty clothes.

11

A Team Decision Making meeting was held on March 24, 2014, and was attended by mother, T.M., two maternal aunts, a maternal cousin, maternal grandmother, and paternal grandmother (S.G., Sr.'s mother). T.M. expressed concerns that mother was using methamphetamine, as she had lost a lot of weight, and there was significant foot traffic in mother's home. Paternal grandmother was also concerned about the number of people at mother's home, but maternal family members claimed people were visiting in the wake of maternal grandfather's death. T.M. also was concerned because J.M. continued to have lice, and also had pink eye.

Mother told the Department she moved in with her friend, Trish K., but a maternal aunt and Trish reported that mother was in the "process" of moving. Mother said she was trying to secure housing at Valley Oasis. She refused to provide the Department with her current address.

Mother had not been participating in counseling or drug testing.

T.M. was also concerned because J.M. told him she had been sleeping on the floor, and that she had been held down to have her hair cut. J.M. also told T.M. that mother would lock herself in a room with other people. The children told a Department social worker that maternal grandmother had kicked the family out because mother was out late "partying" and sometimes took the children with her to "party."

At the conclusion of the meeting, it was decided that the Department would seek a removal warrant for the children. The Department obtained a removal order for the children on April 3, 2014.

The Department attempted to detain the children at mother's last known address, and at an address provided by T.M. and S.G., Sr., as an address where they had visited the children. The Department was unable to locate the children to serve the removal warrant on April 8, 9, or 10th at these addresses.

On April 12, T.M. requested a welfare check on J.M. by the sheriff's department. When the Department and sheriffs went to mother's last known address, maternal grandmother answered the door and reported that mother and the children were not home. Sheriffs walked through the home and confirmed that mother and the children were not

12

there.  Maternal grandmother said she had not had contact with mother or the children, and did not know where they were.

Father S.G., Sr., also was concerned about his children and wanted custody of them.

Appended to the report were numerous supportive documents, including the docket for mother's criminal case, which indicated mother had not completed an alcohol program.

A supplemental petition (§ 387) was filed on April 17, 2014, alleging that all four of mother's children were in danger because of mother's failure to drug test, to participate in drug treatment, and to make the children available for visits with the Department.  Mother's and the children's whereabouts were unknown.  At the April 17, 2014 hearing, the juvenile court noted that mother and the children were AWOL.  The court issued a protective custody warrant for the children, and an arrest warrant for mother.  The court gave the Department discretion to place the children with their fathers when they were located.

An April 29, 2014 Addendum Report documented the Department's efforts to locate the children.  On April 22, 2014, the Department learned that mother was homeless, and using her E.B.T. card in the Antelope Valley Area.  It was later reported that mother had repeatedly used the card in Hemet.  The social worker recalled that mother had family in Hemet.

On April 24, a Department social worker contacted the Palmdale School District, and was advised that the children had not attended school since April 4, 2014, and were not enrolled within any school in the District.  The social worker also contacted the Eastside, Westside, Lancaster, and Keppel School Districts and was informed that the children had not been enrolled in school.

The Department's June 9, 2014 jurisdiction/disposition report on the supplemental petition noted that the Department contacted the Hemet School District on May 7, 2014, and learned that the children had not been enrolled there.  The Department also checked with the San Jacinto School District to no avail.  The Department notified the Department

13

of Justice and other law enforcement agencies in the Antelope Valley and Hemet that the children were missing.

The Department's report recommended that mother "comply with family reunification services" and that she complete and participate in "parenting education, submit to random/on-demand substance abuse testing, individual counseling and attend ALANON."

A June 9, 2014 last minute information for the court reported that the children had been found on June 7, 2014. T.M. had called the sheriff's department, informing them he located mother and the children at a Palmdale address. T.M. had been actively searching for his daughter since she went missing. The children appeared disheveled but healthy, with no marks or bruises. V.T., however, had a severe diaper rash, and was taken for medical attention and determined to have a yeast infection. R.G. and S.G. were placed with paternal grandmother, and J.M. was placed with T.M. V.T. was placed in foster care. Mother was taken into custody.

On June 9, 2014, the juvenile court recalled the warrants. Mother was in custody, and was not present in court. However, she was represented by counsel. The court made orders releasing R.G. and S.G. to the home of their father, who had made a plan for them to stay with paternal grandmother, as he was out of state. J.M. was released to her father, T.M.

At the hearing, T.M.'s counsel informed the court that father was "seeking to close the case with a family law order giving himself sole legal and physical [custody]." S.G., Sr.'s counsel noted that S.G., Sr., joined in that request.

The court continued the jurisdictional hearing on the supplemental petition to July 1. The court ordered the Department to prepare a supplemental report addressing the appropriateness of closing the case with a family law order.

On June 10, mother was arraigned on the supplemental petition. Mother was ordered to provide her most current contact information to her attorney or the social worker. Mother was in custody, and provided her current telephone number to the court.

14

She said she would provide an address to counsel after her release from custody. Mother was ordered to comply with the drug testing requirements of her case plan.

On July 1, 2014, the Department filed an addendum report. The children reported that they had been living in Hemet with their mother's cousin, Cynthia, and then had moved to Trish's house in Palmdale because S.G. was fighting with one of Cynthia's children. The Department social worker observed V.T.'s severe diaper rash. V.T.'s foster mother reported that V.T. screamed whenever she wet her diaper. There were also problems with mother's visitation. During a June 13 visit with V.T., mother accused the caregiver of scratching V.T.'s ear. Mother spent most of the visit complaining about V.T.'s care. Mother also minimized the severity of the rash.

Mother visited with J.M. and V.T. on June 19, and spent most of the visit interrogating J.M. about father's girlfriend. R.G. and S.G. were not at the visit because they were residing with their father in North Dakota. Mother blamed the Department for her case remaining open, and took no responsibility for her actions or her noncompliance with her case plan.

At the conclusion of the report, the Department recommended terminating jurisdiction over J.M., R.G. and S.G. with family law orders granting their fathers legal and physical custody of the children. It made no new recommendations as to V.T.

Mother and her counsel appeared at the July 1 adjudication hearing. Mother objected to the July 1 addendum report, arguing that it was not timely, and that it changed the recommendation for disposition. Minors' counsel pointed out that mother had requested a supplemental report, and that the Department had been ordered to address closing the case with a family law order under section 361.2. The juvenile court overruled mother's objection, and admitted the report into evidence.

Mother asked the juvenile court to set the disposition hearing for contest, based on the "last minute change in recommendation." Mother indicated that she wanted to call the children to testify as witnesses, and the children were not present as their appearance had been waived for the hearing.

15

The parties offered argument as to adjudication, with both the Department and minors' counsel arguing that mother had not complied with her case plan, and had absconded with the children, taking them out of the county with the help of maternal family members. Mother contended that she had been attending AA. Mother admitted she failed to test and comply with her case plan, but only after the protective custody warrant was issued because she was "in fear" and felt the Department was not addressing concerns she had. Mother presented sign-in sheets for AA, but the court did not find the evidence of her participation in AA to be credible, as the sheets included identical signatures for different dates spanning a two-year period.

The court sustained the allegations in the supplemental petition.

The court then inquired about continuing the disposition hearing. Mother again asked to set the hearing for contest.

The Department requested that the court terminate jurisdiction as to all the children except V.T. with a family law order.

Counsel for T.M. argued that mother was engaging in delay tactics, as her only basis for a continuance was to cross-examine the children. Counsel asked for an offer of proof as to what evidence mother would hope to obtain from the children. T.M. asked for custody of J.M. pursuant section 361.2.

Mother argued that she "possibly need[ed] to call the children" because "these matters are set as to what's in the best interest of these children." Counsel argued that she did not have ample time to prepare for disposition in light of the new recommendation to terminate jurisdiction.

Minors' counsel argued that any further delay would be detrimental to his clients. Counsel argued the court should issue orders pursuant to section 361.2 giving custody of the older children to their fathers, and that it would be in the best interest of the children to terminate jurisdiction with a family law order.

As to the notice issue for the changed recommendation, the Department argued that mother had received notice that the Department was ordered to assess termination of jurisdiction with a family law order at the June 9 hearing. T.M.'s counsel also pointed

16

out that he had requested termination of jurisdiction with a family law order at the June 9 hearing.

The court found mother had received adequate notice as to the termination of jurisdiction. The court went on to make findings under 361.2 that the fathers of J.M., R.G. and S.G. wanted custody of them, and that placement of the children with their fathers would not be detrimental to the children, and terminated jurisdiction under family law orders. This timely appeal followed.

## DISCUSSION

Initially, we must address the impact of this court's opinion resolving mother's writ petition as to V.T. Mother's petition challenged the juvenile court's orders terminating reunification services as to V.T. under section 361.5, subdivision (b)(15) and setting the case for a section 366.26 hearing to terminate her parental rights (as to V.T.). In our opinion granting the petition, we concluded that "mother's counsel was essentially ambushed by the children's counsel's invocation of subdivision (b)(15). . . ." (*D.T. v. Superior Court*, *supra*, B257555, p. 15.) We based our decision, in part, on section 358, subdivision (a)(3), and California Rules of Court, rule 5.686(b), which require a continuance of the disposition hearing when the Department contends that a bypass provision under section 361.5, subdivision (b) applies which would deprive a parent of reunification services.

Mother contends that our opinion resolving her writ petition as to V.T. also establishes that her due process rights were violated as to the older three children. We disagree. The situation with the older three children is entirely different than with V.T. Mother received extensive family maintenance services with respect to the older three children. Section 361.5, subdivision (b)(15) was not invoked as to the older children. Instead, jurisdiction was terminated under section 361.2, and, as we discuss below, mother had adequate notice that the juvenile court would consider terminating jurisdiction under this provision. Also, mother did not face termination of her parental rights as to the older three children; she remains free to challenge the custody arrangement in family court.

17

## 1.    Notice of the Hearing

Mother contends her statutory and due process rights were violated when the Department "filed an untimely report which altered its recommendation from offering reunification services to terminating jurisdiction over the children with no reunification services to Mother."  Mother contends that section 358, subdivision (a)(3) requires a continuance if "a social worker is alleging that subdivision (b) of Section 361.5 is applicable . . . ."  However, section 358 relates to the bypass provisions of section 361.5, subdivision (b), which do not apply to mother's older three children.  (§ 358, subd. (a)(3).)

Mother further contends that California Rules of Court, rule 5.690(a)(2) requires Department reports to be filed and served at least 48 hours before the disposition hearing, and requires a continuance if a parent is not timely served with the report.  Specifically, rule 5.690(a)(2) provides that the Department must provide copies of its report to the court's clerk "at least 48 hours before the disposition hearing is set to begin, and the clerk must make the copies available to the parties and attorneys.  A continuance within statutory time limits must be granted on the request of a party who has not been furnished a copy of the social study in accordance with this rule."

The parties do not dispute that the Department's report was late, as it was filed on the day of the hearing.  It does not necessarily follow, however, that the failure to comply with California Rules of Court, rule 5.690 constitutes a deprivation of due process.  (*In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1419; compare with *Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535, 553-558.)  " 'A failure to comply with state or local procedural requirements does not necessarily constitute a denial of due process; the alleged violation must result in a procedure which itself falls short of standards derived from the Due Process Clause. [Citations.]' [Citation.]" (*Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 546.)  Due process only requires " 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' [Citation.]" (*In re A.S.* (2012) 205 Cal.App.4th 1332, 1342.)

18

Here, at the June 9, 2014 hearing, both father T.M. and S.G., Sr., asked the court to terminate jurisdiction and have the older children placed in their custody. Under section 361.2, when a noncustodial parent wants custody, the juvenile court "*shall* place the child with the parent *unless* it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (*Id.*, subd. (a), italics added.) ' "A court's ruling under [section 361.2(a)] that a child should not be placed with a noncustodial, nonoffending parent requires a finding of detriment . . . [Citation.]' [Citation.]" (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 699-700.) That is because "a nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be 'detrimental to the safety, protection, or physical or emotional well-being of the child.' [Citations.]" (*Id.* at p. 697.)

Section 361.2, subdivision (b) gives the juvenile court three options if it places the child with the noncustodial parent. The juvenile court can: (1) order that the parent become legal and physical custodian of the child, and terminate jurisdiction over the child; (2) order that the parent assume custody subject to the juvenile court's jurisdiction and require a home visit within three months; or (3) order that the parent assume custody subject to juvenile court supervision. The juvenile court's discretion to terminate jurisdiction or continue its supervision is very broad and the standard of review is abuse of discretion. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

Here, the fathers sought termination of jurisdiction with a family law order, which necessarily encompassed termination of mother's reunification services. (§ 361.2, subd. (b)(1).) Their intention to seek such an order was made clear on June 9, 2014, well in advance of the July 1, 2014 dispositional hearing. Moreover, the court ordered the Department to investigate the propriety of such an order.

Assuming, without deciding, that mother was entitled to a continuance under California Rules of Court, rule 5.690, mother has not demonstrated prejudice. (See *In re Angela R.* (1989) 212 Cal.App.3d 257, 265.) In order to obtain reversal, mother must

19

demonstrate that the result of the continued hearing would have changed in the absence of error. (*Ibid.*, see also *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We are not persuaded that a continuance would have resulted in a different dispositional order. Mother had not complied with her case plan, and had absconded with the children to avoid Department supervision. She had not addressed the children's lice or educational problems over the course of two academic school years, notwithstanding significant support and guidance from the school and the Department.

Consequently, we also reject mother's claim that the juvenile court abused its discretion in denying her request for a continuance, finding that mother cannot demonstrate she was prejudiced by the court's order. (§ 352, subd. (a); *In re David H.* (2008) 165 Cal.App.4th 1626, 1635.)

## 2.	Sufficiency of the Evidence

Mother challenges the sufficiency of the evidence supporting the juvenile court's finding that the bypass provisions of section 361.5, subdivision (b)(15) applied. However, the juvenile court never made such a finding as to the children subject to this appeal. As we discussed, *ante*, the juvenile court's findings under section 361.5, subdivision (b)(15) related only to V.T. Therefore, we need not reach the merits of this argument.

As a corollary to her argument under section 361.5, subdivision (b)(15), mother contends that the juvenile court abused its discretion when it failed to order reunification services, reasoning that such services were in the children's best interest. Although mother invokes section 361.5, subdivision (c), which does not apply here, we will nonetheless consider mother's argument as a challenge to the court's exercise of discretion under section 361.2. Under section 361.2, the decision to provide reunification services is discretionary, and will be upheld on appeal unless the order exceeds the bounds of reason. (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1288.)

On this record, we can find no abuse of discretion. As discussed, *ante*, mother had not complied with her case plan. Her case had been pending for almost two years, and in that time she had failed to complete counseling, an AA program, had not consistently

20

drug tested, and had completely failed to meet her children's medical and educational needs.

## DISPOSITION

The orders are affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.