Filed 6/28/21  In re Z.Z. CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Z.Z. et al., Persons Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY DEPARTMENT OF HEALTH AND SOCIAL SERVICES,<br><br>      Plaintiff and Respondent,<br>v.<br>L.P.,<br><br>      Defendant and Appellant. | A161162<br><br>(Solano County Super. Ct. Nos. J44948, J44949) |

L.P., mother of minors Z.Z. and S.P., appeals from the juvenile court's jurisdiction and disposition orders finding jurisdiction over the minors and placing them with their maternal grandmother, and ordering visitation and reunification services.  L.P. contends the juvenile court violated her due process rights when it failed to advise her of her hearing rights and failed to obtain a knowing and intelligent waiver of those rights as required by California Rules of Court, rule 5.682.[1]  We find the juvenile court violated

_____

[1] All rule references are to the California Rules of Court.

1

rule 5.682.  However, because we find the error harmless beyond a reasonable doubt, we affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Petition and Detention Report

On May 7, 2020, the Solano County Department of Health and Social Services, Child Welfare Division (Department), filed a dependency petition alleging that L.P.'s two daughters, Z.Z. (age 13) and S.P. (age 5), came within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300.[2]  Regarding L.P.,[3] the petition alleged that she had a history of mental health issues which periodically rendered her incapable of providing adequate care, supervision, and support for Z.Z. and S.P.  It further alleged that on May 4, 2020, S.P. witnessed L.P. threaten to kill herself as she put a knife to her own throat.  S.P. allegedly grabbed the knife from her mother and threw it to the ground.  Both Z.Z. and S.P. allegedly expressed fear of being left in L.P.'s care.

The detention report stated the Department had been informed by the reporting party that L.P. was about to be released from the crisis unit at the NorthBay Healthcare hospital where she had been admitted "due to ongoing suicidal and homicidal ideations in the presence of . . . [S.P.]."  The reporting party informed the Department that L.P. has had mental health challenges for the past two to three years and that L.P. stated, "[W]e are gone [*sic*] die together," in reference to herself and S.P.

---

[2] All statutory references are to the Welfare and Institutions Code.

[3] The petition also included allegations regarding Z.Z.'s father, whose whereabouts were unknown, and S.P.'s father, who was incarcerated.  We do not address the allegations regarding the fathers because neither of them has challenged the orders and the facts regarding the fathers are not relevant to the issues raised by L.P.

A Department social worker interviewed the minors' maternal grandmother, C.R., on May 4, 2020. C.R. reported that on April 30, 2020, L.P. told C.R. that she was having suicidal thoughts and that if she killed herself and S.P. they would both go to heaven. C.R. contacted the police, who responded but determined that L.P. did not meet the requirements for an involuntary hold under section 5150.[4] C.R. reported that four days later, on May 4, 2020 (the day of her interview with the Department), L.P. dropped S.P. off at C.R.'s home and then left. S.P. told C.R. that she and her mother had been in a car accident that morning and that after the accident, L.P. held a knife to her throat and threatened to kill herself and S.P. pulled the knife away from her mother. About two hours after dropping S.P. off at C.R.'s home, L.P. called C.R. and said she was having suicidal thoughts and was planning to check herself into a NorthBay hospital. C.R. also reported to the Department that Z.Z. had been living with her for about three years, with L.P.'s consent.

The Department social worker interviewed S.P., who confirmed that she and her mother had been in a car accident that morning. S.P. reported her left ear hit the car seat and that it hurt at the time but not by the time of the interview. S.P. also said that when she and her mother got home, her mother put a knife against her throat and S.P. " 'snatched' the knife away . . . ." L.P. told S.P. that she wanted to die. S.P. told her mother that she wanted to go to C.R.'s home, and L.P. responded that she would drive into a lake with S.P. L.P. then told S.P. that she could walk alone to C.R.'s home. When S.P. expressed fear of being kidnapped, L.P. said she did not care. S.P.

_____

[4] Under section 5150, a designated facility may detain a person for up to 72 hours for evaluation and treatment if there is "probable cause to believe that the person is, as a result of a mental health disorder, a danger to others, or to himself or herself, or gravely disabled."

3

walked to C.R.'s house, and L.P. followed her, "call[ing] her names such as 'bitch' and 'whore.' " S.P. denied that her mother physically disciplined her, but she reported that her mother hit and pushed Z.Z. and called her names. S.P. told the social worker that she did not feel safe at her mother's home and that "she is afraid her mother will kill herself and then she 'will be alone.' "

Z.Z. reported to the social worker that she had been living with C.R. for about three years and visits L.P. every other week. Z.Z. reported several recent incidents of physical abuse, which included L.P.'s pushing Z.Z. into a bathtub as punishment for not cleaning it properly, punching Z.Z., throwing her on a bed, and throwing coffee on her. Z.Z. also reported her mother called her "a 'fucking bitch' . . . ."

The social worker spoke with L.P. by telephone on May 6, 2020. L.P. admitted having suicidal thoughts and being hospitalized but denied the other statements made by her mother and her daughters, including that S.P. was present when she tried to commit suicide. She said that claim "was 'hilarious.' "

The Department recommended that the children be detained and that the juvenile court consider placement with their maternal grandmother, C.R.

## II.  Detention Hearing

L.P. did not attend the May 8, 2020 detention hearing. She was appointed counsel, who reported that L.P. was in a psychiatric hospital in Santa Rosa. The juvenile court followed the Department's recommendation and issued orders detaining the minors and placing them in the care of C.R. The detention orders stated that counsel had been appointed to advise the parties of their rights.[5]

---

[5] The detention orders included a "Solano County Specific Findings and Orders Attachment," which stated under the "Advisements" heading:  "The

## III. Jurisdiction/Disposition Report

On June 18, 2020, the Department filed a combined jurisdiction/disposition report recommending the continued detention of the minors; that the juvenile court sustain the section 300, subdivision (b)(1) allegations regarding L.P. and adjudge the minors dependents of the court; and that family reunification services be offered to L.P. Evidence supporting the allegations included C.R.'s report that L.P.'s mental health had been " 'up and down' " for three years and that L.P. had recently been hearing voices and having suicidal thoughts; S.P.'s statements that her mother held a knife

court has appointed counsel to inform and advise the parties that have appeared in this matter of the following: The right of the child and each parent, legal guardian, and Indian custodian to be present and to be represented by counsel at every stage of the proceedings and, if any of these parties are financially unable to retain counsel, any right to appointed counsel that exists, subject to the court's right to seek reimbursement. The right to be informed by the court of the contents of the petition; the nature of and possible consequences of juvenile court proceedings; the reasons for the initial detention and the purpose and scope of the detention hearing if the child is detained; the right to have a child who is detained immediately returned to the home of the parent, legal guardian, or Indian custodian if the petition is not sustained; that if the petition is sustained and the child is removed from the care of the parent, legal guardian, or Indian custodian, the time for services will commence on the date disposition; that the time for services will not exceed 12 months for a child aged three years or over at the time of the initial removal; and that the time for services will not exceed 6 months for a child under the age of three years or for the member of a sibling group that includes a child under the age of three years if the parent, legal guardian, or Indian custodian fails to participate regularly and make substantive progress in any court-ordered treatment program, The right to a hearing by the court of the issues presented by the petition. The right to assert the privilege against self-incrimination; to confront and cross-examine the persons who prepared reports or documents submitted to the court by the petitioner and the witnesses called to testify against the parent, legal guardian; or Indian custodian; to subpoena witnesses; and to present evidence on one's own behalf." (*Sic.*)

to her throat and said she wanted to die and that S.P. does not feel safe at her mother's home; and Z.Z.'s reports of incidents of physical abuse during her visits with her mother.  The social worker reported that during a video conference on June 9, 2020, neither minor wished to speak with her about the allegations.  However, on June 12, 2020, the social worker spoke with Z.Z., who reported she wanted to continue living with C.R.

The report summarized a discussion with L.P. regarding the allegations.  L.P. initially said "she was 'not sure what happened that day' " but denied placing a knife to her throat or that S.P. had to remove the knife from her.  She acknowledged that she began to hear voices and said she contacted the police, but they told her she did not meet the criteria for a 5150 hold.  She then decided to leave her children with C.R. and drove herself to the hospital where she was placed on a 5150 hold.  L.P. denied ever harming her children.  When asked why she thought her children's accounts differed from hers, L.P. responded, " 'I have noticed that when my children are coming from my mom's house there are lies.' "  L.P. further stated that someone in Solano County " 'has it out' for her . . . ."  She acknowledged that she struggles with mental health but that this was the first time she heard voices or felt it necessary to seek crisis intervention.  L.P. reported that she was diagnosed with bipolar disorder and had completed a two-week mental health program at a hospital in Santa Clara.  She said she was following her discharge plan, which included medication and attending support groups.

The report summarized 21 prior child welfare referrals from June 2009 to April 2020 in Solano, San Joaquin, and Sacramento Counties, 20 of which were evaluated out, inconclusive, or unfounded.  One 2015 referral in San Joaquin County for general neglect of Z.Z. was substantiated.

6

L.P. was asked to participate in a random drug test on June 10, 2020, but she did not appear.  Nor did she respond to the social worker's follow-up messages.  L.P.'s video conference visits with the children were going well with no concerns.[6]

## IV.    Restraining Order

During July 2020 the Department social worker visited C.R.'s home, and C.R. reported concerns that L.P. had been calling other family members and stating that C.R. and the children "were 'dead.' "  C.R. also reported that L.P. called her up to 60 times a day saying, " '[Y]ou took my kids; I will take your life.' "  On July 27, 2020, C.R. e-mailed the social worker recordings of the phone conversations.

On July 30, 2020, L.P. contacted the Fairfield police to complain that C.R. would not release L.P.'s children to her.  The police spoke with C.R., who told them that the Department had placed the children with her.

The next day, L.P. went to C.R.'s home, demanding that the children be given to her.  The police responded, and C.R. provided documentation confirming that the children had been placed in her care.  L.P. said the documents were " 'fake,' " and she refused to leave the premises.  After resisting and struggling with the police, L.P. was arrested for trespass and resisting arrest.  One of the police officers at the scene reported that he observed symptoms of intoxication, including "rapid speech, paranoia, incoherent statements and irritability."  The officer believed L.P. was "under the influence of a 'central nervous system stimulant.' "

On August 4, 2020, the Department filed a request for a restraining order to protect C.R. and the children from L.P.  That day, L.P., who was in custody due to her arrest on July 31, appeared in juvenile court with her

_____

[6] Due to Covid-19, in-person visitation was suspended.

counsel. She requested a contested jurisdiction/disposition hearing. The juvenile court issued a temporary restraining order pending the August 25, 2020 jurisdiction/disposition hearing.

## V. Addendum Report

On August 24, 2020, the Department filed an addendum report, attaching the police report and updating the juvenile court on the events leading up to L.P.'s arrest and the request for a restraining order. The addendum report also stated the following regarding contacts with L.P.: On August 6, 2020, the social worker met with L.P. in advance of her first in-person visit with the children. L.P. told the social worker she would only need 10 minutes, to tell the children " 'she was signing over her parental rights.' " The social worker told L.P. she was not to discuss the case with the children during the visit. L.P. was provided a copy of a case plan and court reports, and she stated they were all " 'fake.' " She refused to sign the case plan and commented, " '[T]here is evil all around.' " The visit with the children was cut short because L.P. did not abide by the instruction not to discuss the case with them.

On August 11, L.P. called the social worker and asked what she had to do to have the children in her care. The social worker noted that L.P.'s demeanor was "drastically different" than in their last conversation. L.P. asked for a copy of the case plan and said she wanted to discuss reunification. L.P. agreed to submit to a drug test, and on August 17 she tested positive for marijuana.

The social worker recommended that the restraining order remain in place because of L.P.'s unpredictable behaviors, threats to C.R., and concerns of further traumatization of the children. The addendum report concluded that L.P. continued to struggle with her mental health and that she appeared

8

to suffer episodes of severe mood swings common with bipolar disorder, which L.P. self-reported as her diagnosis. The social worker reported that she had been unable to verify whether L.P. was receiving treatment in accordance with the recommendations of her mental health providers.

## VI. Jurisdiction/Disposition Hearing

At the trial management conference on the morning of August 25, 2020, L.P.'s counsel stated that L.P. was in court but he did not know where she was when the case was called. He told the court that he had had several conversations with L.P. and that she initially wanted to confirm the contested hearing but after they talked and L.P. read the report, she now wanted "to object and submit." The matter was continued to the afternoon session, at which time L.P. appeared with her counsel. L.P.'s counsel informed the juvenile court that L.P. intended to object and submit and start on her reunification services. He also stated that L.P. would object and submit on the restraining order given that it allowed for supervised visitation. L.P.'s counsel reported that L.P. was doing very well, that she would respect the restraining order, and that he expected a positive result in the matter. The juvenile court replied, "That's really good news, because the object here is to reunify family . . . , but some hard work sometimes has to go into doing that." Later in the hearing, the juvenile court confirmed, "[L.P.] is objecting and submitting?" and her counsel responded, "Correct, Your Honor."

The juvenile court received into evidence the Department's reports dated May 7, 2020, June 18, 2020, and August 24, 2020; sustained the allegations of the petition, finding that the children fell within section 300, subdivisions (b) and (g); and ordered reunification services for L.P. The juvenile court also granted the restraining order and set it to expire on July 6, 2021.

9

The juvenile court did not advise L.P. of her rights on the record, and L.P. did not submit Judicial Counsel Forms, form JV-190 (Waiver of Rights—Juvenile Dependency).

## DISCUSSION

**I.** ***The juvenile court's failure to advise of hearing rights on the record and obtain an explicit waiver of rights violated due process.***

L.P. contends the juvenile court violated her due process rights by failing to advise her of her hearing rights and failing to obtain a knowing and intelligent waiver of those rights before finding the allegations of the petition true. The Department does not dispute that the juvenile court failed to give L.P. the required advisements at the jurisdiction/disposition hearing and did not obtain a personal waiver from her before ruling on the petition. Nonetheless, the Department argues the orders should be affirmed because the errors were harmless beyond a reasonable doubt.

We agree with the parties that the juvenile court abused its discretion when it failed to properly advise L.P. of her rights at the jurisdiction/disposition hearing before accepting her submission. "[E]ven if the parent does not contest the allegations [of a section 300 petition], the court must advise the parent of the parent's rights to receive a hearing on the issues raised by the petition, to assert any privilege against self-incrimination, to confront and cross-examine witnesses, to compel witnesses' attendance, and to have the child returned if the court finds that the child does not come within the jurisdiction of the juvenile court under section 300. (Rule 5.682(b).)[7] If, after being so advised, the parent wishes to admit the

---

[7] The required advisements are set forth in rules 5.534(g)(1) and 5.682. Rule 5.534(g)(1) states: "The court must advise the . . . parent . . . in section 300 cases . . . of the following rights:

"(A) The right to assert the privilege against self-incrimination;

10

"(B) The right to confront and cross-examine the persons who prepared reports or documents submitted to the court by the petitioner and the witnesses called to testify at the hearing;

"(C) The right to use the process of the court to bring in witnesses; and

"(D) The right to present evidence to the court."

Rule 5.682 provides the advisements required to be given by the juvenile court at the jurisdiction hearing. It states in relevant part:

"(a) . . . [¶] After giving the advisement required by rule 5.534, the court must advise the parent . . . of the following rights:

"(1) The right to a hearing by the court on the issues raised by the petition . . . . [¶] . . . [¶]

"(b) The court must then inquire whether the parent . . . intends to admit or deny the allegations of the petition. If the parent . . . neither admits nor denies the allegations, the court must state on the record that the parent . . . does not admit the allegations. If the parent . . . wishes to admit the allegations, the court must first find and state on the record that it is satisfied that the parent . . . understands the nature of the allegations and the direct consequences of the admission, and understands and waives the rights in (a) and (e)(3).

"(c) An admission by the parent . . . must be made personally by the parent . . . .

"(d) The parent . . . may elect to admit the allegations of the petition or plead no contest and waive further jurisdictional hearing. The parent . . . may elect to submit the jurisdictional determination to the court based on the information provided to the court and choose whether to waive further jurisdictional hearing. If the parent . . . submits to the jurisdictional determination in writing, *Waiver of Rights—Juvenile Dependency* (form JV-190) must be completed by the parent . . . and counsel and submitted to the court.

"(e) . . . [¶] After admission, plea of no contest, or submission, the court must make the following findings noted in the order of the court: [¶] . . . [¶]

"(3) The parent . . . has knowingly and intelligently waived the right to a trial on the issues by the court, the right to assert the privilege against self-incrimination, and the right to confront and to cross-examine adverse witnesses and to use the process of the court to compel the attendance of witnesses on the parent['s] . . . behalf;

"(4) The parent . . . understands the nature of the conduct alleged in the petition and the possible consequences of an admission, plea of no contest, or submission;

11

allegations or enter a plea of no contest (see rule 5.682(e)), the court must find and state on the record that it is satisfied that the parent understands the nature of the allegations and the direct consequences of the admission, and understands and knowingly and intelligently waives the rights in rule 5.682(b). (Rule 5.682(c), (f).)" (*In re S.N.* (2016) 2 Cal.App.5th 665, 671.)

Here, although the May 15, 2020 detention orders advised L.P. of her hearing rights, the juvenile court did not properly advise her of these rights on the record at the jurisdiction/disposition hearing; nor did it find and state on the record that L.P. knowingly and intelligently waived her hearing rights. Rule 5.682 specifically requires that the juvenile court advise the parent of his or her hearing rights and that the juvenile court's order confirm that the parent has knowingly and intelligently waived those rights. (Rule 5.682(a), (e).) Failure to comply with these requirements is error. (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1377.)

## II.   *Harmless Error*

Although the due process rights protected by these rules implicate a parent's fundamental right to care for and have custody of his or her child, a juvenile court's failure to advise of hearing rights and confirm a parent has knowingly and intelligently waived those rights is subject to a harmless error analysis. (*In re S.N., supra*, 2 Cal.App.5th at p. 672; *In re Monique T., supra*, 2 Cal.App.4th at p. 1377.) L.P. relies on *Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535 (*Judith P.*) and argues that the juvenile court's errors were structural and should be considered reversible per se. *Judith P.* is inapposite.

---

"(5) The admission, plea of no contest, or submission by the parent . . . is freely and voluntarily made; . . ."

12

In *Judith P.*, in violation of the 10-day service requirement of section 366.21, the mother received the department's status report recommending termination of reunification services on the same day as the 12-month review hearing, during which the juvenile court terminated reunification services. (*Judith P., supra*, 102 Cal.App.4th at pp. 542–544.) The court found that the untimely service of the report impaired the mother's ability to be heard and was a due process violation that rendered the proceedings fundamentally unfair. (*Id.* at pp. 539–540, 553–558.) This was a structural error that required automatic reversal of the order setting the case for a permanency hearing. (*Id.* at pp. 556–558.) In contrast, here, L.P. does not raise the issue of timely service of the petition or the Department's reports. L.P. was represented by counsel throughout the proceedings; she reviewed the Department's report with her counsel; and she spoke directly with the Department on multiple occasions regarding the allegations of the petition.

Not only is *Judith P.* distinguishable from this case, but also, as L.P. acknowledges, since *Judith P.*, our Supreme Court has twice applied a harmless error analysis in dependency cases. (See *In re James F.* (2008) 42 Cal.4th 901, 915–916 [finding juvenile court's failure to follow proper procedure for appointing a guardian ad litem for parent was harmless error and stating "significant differences between criminal proceedings and dependency proceedings provide reason to question whether the structural error doctrine that has been established for certain errors in criminal proceedings should be imported wholesale, or unthinkingly, into the quite different context of dependency cases"]; *In re Celine R.* (2003) 31 Cal.4th 45, 58–59 [rejecting analogy to criminal cases and applying harmless error analysis to improper joint representation of children in dependency case].)

*In re Monique T., supra*, held that the failure to advise of hearing rights on the record and to obtain a personal waiver of rights is subject to harmless error analysis. (2 Cal.App.4th at p. 1378.) *In re Monique T.* applied the stricter *Chapman* standard and determined the error was harmless beyond a reasonable doubt. (*Ibid.*, citing *Chapman v. California* (1967) 386 U.S. 18.) Because the facts of *In re Monique T.* supported a finding that the error was harmless beyond a reasonable doubt, the court did not decide whether the more easily met "reasonable probability" test (*People v. Watson* (1956) 46 Cal.2d 818) should apply to this type of error. (*In re Monique T.*, at p. 1378.) *In re S.N., supra*, addressed the same type of error and held that the *Chapman* test applied. (2 Cal.App.5th at p. 672.) It found the juvenile court's failure to properly advise the mother of her rights at the jurisdictional hearing before accepting her submission was harmless beyond a reasonable doubt based on the overwhelming evidence supporting a finding of jurisdiction. (*Ibid.*)

We need not decide whether the *Watson* or *Chapman* standard of prejudice is the correct test because we find no prejudice even under the stricter *Chapman* standard. We conclude that the juvenile court's error in failing to advise L.P. of her rights and failing to obtain a knowing and intelligent waiver from her personally was harmless beyond a reasonable doubt. L.P. was represented by counsel throughout the proceeding. The May 15, 2020 detention orders appointing counsel state that counsel was to provide the advisements to the parties. At the August 4, 2020 hearing, which L.P. attended, her counsel stated he had discussed the proceedings with his client and that she wanted to set the matter for a contested hearing. At the jurisdiction/disposition hearing on August 25, 2020, L.P.'s counsel informed the juvenile court that L.P. initially wanted to proceed with a contested

14

hearing but after she talked with counsel and read the report, she now wanted to object and submit and proceed with reunification services. Although the juvenile court erred in not advising L.P. of her rights on the record and not obtaining a personal waiver from her, the record indicates that L.P. was informed of the allegations and that her counsel explained her options, including whether to contest jurisdiction or submit. L.P. does not contend that her counsel was ineffective for failing to explain her rights to her or that she was pressured to waive her rights. (See *In re Monique T., supra*, 2 Cal.App.4th at p. 1378.)

Moreover, we find that the evidence supporting jurisdiction was overwhelming. It included the following: L.P.'s recent hospitalization for mental health treatment after she complained of hearing voices and having suicidal thoughts and was placed on a 5150 hold; L.P.'s statement that she had been diagnosed with bipolar disorder and was undergoing treatment; statements from five-year-old S.P. that L.P. threatened to kill herself in front of S.P.; statements from both children that they were afraid to be alone with L.P.; statements from Z.Z. and S.P. that L.P. had physically and verbally abused Z.Z.; statements from C.R. regarding L.P.'s ongoing mental health issues and repeated threatening phone calls from L.P. after the children were placed in C.R.'s care; the police report regarding L.P.'s arrest after she refused to leave C.R.'s home; and L.P.'s statement that the Department's petition and the detention order were " 'fake.' " The evidence overwhelmingly supports the juvenile court's jurisdiction and disposition findings, and we find beyond a reasonable doubt that L.P. could not have successfully contested jurisdiction had she opted to do so after being informed of her rights on the record. The error was harmless beyond a reasonable doubt.

15

## DISPOSITION

The orders of the juvenile court are affirmed.

_____
Jackson, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A161162/*Solano County Dept. of Health & Social Services v. L.P.*

17